# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1686
_____

James E. Norman,

   Appellee,

  v.

Tim Schuetzle; Marc Schwehr; Mary Materi,

   Appellants.

_____

No. 08-2219
_____

James E. Norman,

   Appellee,

  v.

Dan Wrolstad,

   Appellant.

Appeals from the United States
District Court for the
District of North Dakota.

[PUBLISHED]

_____

Submitted: February 13, 2009
Filed: November 9, 2009

_____

Before WOLLMAN, HANSEN, and BYE, Circuit Judges.
_____

HANSEN, Circuit Judge.

Following an attack by a fellow inmate, James Norman, the appellee and an inmate at the North Dakota State Penitentiary (NDSP), filed a 42 U.S.C. § 1983 claim against various prison officials for their alleged failure to protect him in violation of the Eighth Amendment. The district court granted qualified immunity to all but four of the prison officials, who then filed these consolidated interlocutory appeals from the denial of their motions for qualified immunity. We reverse and remand for entry of summary judgment based on qualified immunity in favor of each of the appellants.

I.

In the context of an interlocutory appeal from the denial of qualified immunity, we construe the evidence in the light most favorable to Norman, the nonmoving party. See Brown v. Fortner, 518 F.3d 552, 555 (8th Cir. 2008). Norman was assaulted by inmate Michael Meyers on September 22, 2005, while the two were in the traffic hallway of the NDSP before breakfast. Meyers approached Norman from behind as Norman came out of the showers and hit him, knocking him to the ground. He continued hitting and kicking him until a guard intervened. Norman received a cut above his eye requiring stitches, a broken nose, numerous abrasions, and a concussion.

We turn now to the events that occurred prior to the assault that form the basis for Norman's claim that the prison officials knew of a substantial risk that Norman would be assaulted. Early in 2005, Norman filed several "kites" (or prison grievances) against Appellant Dan Wrolstad, the NDSP's Director of Education, who supervised a restaurant management class at the prison. Norman charged that Wrolstad operated the restaurant program illegally and sought to get him fired. The kites related to an inmate cookout to be held by the restaurant management class in May 2005, as well

as Wrolstad's use of grant funds within the program.  Norman sent a kite to Appellant Warden Tim Schuetzle on March 7, 2005, complaining that Wrolstad allowed other inmates to read the kites Norman had filed against Wrolstad.  Schuetzle responded to Norman the next day, stating that "Mr. Wrolstad should not show your kites to other inmates, but he does have to research & respond to your questions."  (Appellee's App. at 25.)  Norman continued to send letters to Wrolstad complaining about the restaurant management class.

Norman sent a letter to Corky Stromme, the NDSP Chief of Security (Stromme was granted qualified immunity), dated June 28, 2005, again complaining that Wrolstad showed his kites to other prisoners and allowed them to pass the kites among the other inmates.  Although he complained that Wrolstad was trying to get other inmates to "do his dirty work" and trying to incite other inmates to assault him, Norman did not request protection, but "ask[ed] for Mr. Wrolstad's termination."  (Id. at 26.)  In a June 30 addendum to the June 28 kite, Norman stated that another inmate told him that Wrolstad told the other inmate to stay away from Norman because Norman was "going to get beat up," and Norman wrote that "Wrolstad is soliciting for someone to beat me up."  (Id. at 27.)  Again, Norman did not seek protection but ended the kite by asking for a meeting to discuss what was going to be done with Mr. Wrolstad and stating, "I'm asking for his job."  (Id.)  Norman added a note stating, "This has nothing to do with inmates getting my paperwork, this is all Mr. Wrolstad. Any inmate would take paperwork given to them by a Staff member.  It's Wrolstad's motive behind doing it."  (Id.)  Stromme turned the kite over to Bob Coad, an NDSP Deputy Warden, who was Wrolstad's supervisor.  Coad investigated the complaint by discussing it with Wrolstad, who provided a written response denying the allegations that he showed Norman's kites to other inmates and denying that he had solicited anyone to beat up Norman.  Coad provided the written response to Norman, who, in the meantime, continued sending kites to Stromme and to LeAnn Bertsch, the Director of the North Dakota Department of Corrections, seeking to get Wrolstad fired. Wrolstad's response triggered more kites from Norman in July 2005 addressed to

Coad and Stromme complaining about what Norman deemed an inadequate investigation into Wrolstad's activities in the education department.

Wrolstad allegedly showed the kites to inmate Jeremy Bryant, who showed the kites to Michael Meyers, the inmate who ultimately assaulted Norman on September 22, 2005. Meyers had a history of assaultive behavior at the NDSP prior to his assault on Norman. He had five administrative arrests related to assaults on fellow inmates between December 2003 and December 2004. Meyers was placed in administrative segregation, served his time, and was ultimately released into the general population in February 2005 pursuant to an "administrative contract." After his release into the general population, Meyers was involved in the Intensive Anger Management program and earned his way into a preferred housing unit based on his positive behavior. Meyers had no disciplinary problems between February 2005 and his assault on Norman in September 2005, except one incident in July. Meyers worked as an inmate barber, and, while cutting another inmate's hair, he shaved the letter "C" into the back of the inmate's hair to identify him as a child molester. He corrected the haircut the same day.

About two weeks prior to Meyers' assault on Norman, an inmate approached Appellant Mary Materi, an NDSP Case Worker in the East Cell House (where Norman was housed), and told her that a black man was looking to hire someone to assault Norman. Materi told the inmate she would need to verify the claim and asked for the name of the inmate looking to hire the assault but did not further investigate the allegation. The day before the assault, Brian Taylor, an NDSP Case Worker in the West Cell House, called Appellant Marc Schwehr, a Case Worker in the East Cell House, and told Schwehr that Meyers had joked around about fighting with Norman. On the same evening, Meyers, who, as mentioned earlier was an inmate barber, talked to Schwehr about letting Norman out of his cell for a haircut. Schwehr refused because Norman was on cell confinement. Meyers tried to convince Schwehr that inmates could be let out of cell confinement for haircuts, but Schwehr still refused.

Meyers also sent a package to Norman containing a towel, which was delivered to Norman that night by Schwehr.

Schwehr made a note in the East Cell House logbook that night which stated "Meyers, Michael #2427 may assault Norman, James #16372, Lt. was notified." (Appellants' App. at 42.) Schwehr took no other action, stating in his affidavit that he did not take the threat seriously because Meyers often joked around. The next morning, Materi reported for duty and made an entry in the logbook at 5:30 am: "Materi on Duty, Log Reviewed." (Id. at 46.) She then conducted morning roll-out, which is when the inmates are let out of their cells to shower, take medications, and go to breakfast. It was during this time that Meyers assaulted Norman by attacking him from behind while they were both in the traffic hallway.

Norman brought a civil action under 42 U.S.C. § 1983 in February 2006 against various NDSP officials, claiming that his right to be free from cruel and unusual punishment under the Eighth Amendment was violated when the defendants failed to protect him from Meyers' assault. The magistrate judge, presiding with the consent of the parties pursuant to 28 U.S.C. § 636(c), entered an order on February 7, 2008, granting summary judgment to some of the named defendants but denying it as to Schuetzle, Schwehr, and Materi, concluding that fact issues precluded their claims to qualified immunity. The court deferred ruling on Wrolstad's motion for summary judgment to allow Norman, who was proceeding pro se, to submit additional evidence regarding whether Wrolstad supplied Norman's kites to other inmates. On May 23, 2008, the court concluded that fact issues precluded finding Wrolstad entitled to qualified immunity on summary judgment. Each of the prison officials filed an interlocutory appeal of the denial of his or her claim of qualified immunity, and our court granted their joint motion to consolidate the appeals.

## II.

In this interlocutory appeal from the denial of summary judgment based on a claim of qualified immunity, we review the district court's decision *de novo*. See Irving v. Dormire, 519 F.3d 441, 445 (8th Cir. 2008). Our review is limited to the legal issue of whether, considering the facts in the light most favorable to Norman, there was a violation of any clearly established federal right. Id. at 445-46. Although we lack jurisdiction to review a district court's conclusion that the summary judgment record raised a genuine issue of material fact concerning the government officials' involvement in actions that, if true, would have violated the petitioner's constitutional rights, see Johnson v. Jones, 515 U.S. 304, 313 (1995), we may still "examine the facts as they were known to the government official[s] in order to determine whether clearly established law would be violated by [their] actions," Reece v. Groose, 60 F.3d 487, 489 (8th Cir. 1995) (discussing Anderson v. Creighton, 483 U.S. 635 (1987)). Although "this usually means adopting the plaintiff's version of the facts" in qualified immunity cases, the court must limit its consideration to submissions that are admissible at trial. Moore v. Indehar, 514 F.3d 756, 758 (8th Cir. 2008) (internal marks and citations omitted). "As with any summary judgment motion, while we are required to make all reasonable inferences in favor of the non-moving party, we do not resort to speculation." Brown, 518 F.3d at 558.

Qualified immunity protects a prison official from having to defend against a § 1983 lawsuit premised on the official's performance of discretionary functions as long as the prison official's actions do not violate an inmate's "clearly established statutory or constitutional rights of which a reasonable person would have known." Young v. Selk, 508 F.3d 868, 871 (8th Cir. 2007) (internal marks omitted). In determining whether a prison official is entitled to qualified immunity, courts generally look first at whether the official's alleged conduct violated the inmate's federal rights at all and, if so, then ask whether the right was clearly established at the time of the conduct. Irving, 519 F.3d at 446 (discussing Saucier v. Katz, 533 U.S.

194, 201 (2001)); but see Pearson v. Callahan, 129 S. Ct. 808, 813 (2009) (holding that the Saucier two-step process is not "an inflexible requirement"). Where "the unlawfulness of the officers' conduct . . . was not clearly established, [the officers] are entitled to qualified immunity." Pearson, 129 S. Ct. at 823.

Norman's claims against Warden Schuetzle and Case Workers Schwehr and Materi are based on a claim of deliberate indifference to the claimed substantial risk that Meyers would assault Norman. Because it was clearly established in 2005 that prison officials had a duty to protect an inmate from attacks by other inmates, see Young, 508 F.3d at 875 ("[I]t was no doubt clearly established long before 2004 . . . that the eighth amendment required prison officials to protect prisoners from violence at the hands of other prisoners." (internal marks omitted)), we focus our attention on the first prong–whether any of the appellants' actions, viewed in the light most favorable to Norman, violated Norman's Eighth Amendment rights.

The Eighth Amendment prohibits the government from engaging in cruel and unusual punishment, which requires that prison officials take reasonable measures to protect inmates from violence from other inmates. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). While inmates have an Eighth Amendment "right to be protected from harm by fellow inmates . . . , prison officials violate this right only when they exhibit a 'deliberate or callous indifference' to an inmate's safety." Tucker v. Evans, 276 F.3d 999, 1001 (8th Cir. 2002) (quoting Davidson v. Cannon, 474 U.S. 344, 347 (1986) (internal citations omitted)). In a prisoner Eighth Amendment claim, the "prisoner must satisfy two requirements, one objective and one subjective. The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious. The second requirement is subjective and requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.'" Irving, 519 F.3d at 446 (quoting Farmer, 511 U.S. at 834) (internal citation omitted). In a claim involving an assault by one inmate on another, the subjective component asks whether the prison official was deliberately indifferent to a serious risk of an attack on the

inmate. Id. The subjective component requires that the official was both "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also draw the inference.'" Pagels v. Morrison, 335 F.3d 736, 740 (8th Cir. 2003) (quoting Farmer, 511 U.S. at 837). Negligence on the part of the prison official is insufficient to satisfy the subjective component; the official must recklessly disregard a known, excessive risk of serious harm to the inmate. Id. Given the subjective culpability requirement, we address each prison official's entitlement to qualified immunity individually.

A.     Warden Schuetzle

Norman's "case against [Warden] Schuetzle is based on the claim that inmate Meyers was a substantial risk to other inmates, not just Norman, and that [Warden] Schuetzle was deliberately indifferent to that risk." (Appellee's Br. at 37.) The district court found, and Norman concedes, that there is no evidence that the Warden was aware of any of the information known by Case Workers Taylor, Materi, or Schwehr on September 21 and 22. Warden Schuetzle cannot be held liable under a supervisory theory absent notice of a pattern of unconstitutional acts by his subordinates, see Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996), and the information known by the individual case workers cannot be imputed to the Warden under the facts of this case.

Norman attempts to hold Warden Schuetzle liable for allowing Meyers into the general population despite Meyers' dangerousness, pointing to the fact that Meyers had five prior administrative convictions related to assaulting other inmates and had been placed in administrative segregation. As Norman concedes, however, Meyers had served his time in administrative segregation; he was released back into the general population pursuant to an Administrative Segregation Contract in February 2005, which placed conditions on his return to the general population and required Meyers to participate in an Intensive Anger Management program. Following his

-8-

release from administrative segregation, he also earned his way into a preferred housing unit based on his demonstrated positive behavior.

The district court relied on the haircut incident that occurred in July 2005 to conclude that there was evidence from which a jury could find that prison officials, including Warden Schuetzle, were aware that Meyers presented a substantial risk to other inmates but failed to take appropriate corrective action.[1] The district court concluded that a jury could find that, given Meyers' prior assaultive behavior, prison officials should have had steps in place requiring prompt protective measures in the event of any type of threat by Meyers, that the haircut incident could have prompted such protective measures be taken, and that the prison officials therefore acted unreasonably in failing to remove Meyers from the general population following the haircut incident.

The facts as presented by Norman did not put Warden Schuetzle on notice that Meyers presented a substantial risk of harm to inmates in the general population such that he should have foreseen Meyers' attack on Norman. The subjective component of the qualified immunity inquiry requires that the official "knew of and disregarded an excessive risk to" the inmate's safety. Pagels, 335 F.3d at 740. While "'a factfinder may conclude that a prison official knew of a substantial risk from the fact that the risk was obvious,'" Reece, 60 F.3d at 491 (quoting Farmer, 511 U.S. at 842), the fact remains that the prison official must still draw the inference, see Pagels, 335 F.3d at 740. The Supreme Court made clear in Farmer that a prison official cannot be held liable for a prisoner attack unless he was subjectively aware of the risk and recklessly ignored it. See Farmer, 511 U.S. at 841-42 ("[W]e cannot accept petitioner's argument

---

[1]There is a dispute about whether Warden Schuetzle was aware of the haircut incident, but in this interlocutory appeal, we accept the allegation that he was aware of it as supported by the affidavit filed by the inmate who received the haircut claiming that he filed a grievance following the haircut, which would have alerted Schuetzle to the incident.

that Canton [v. Harris, 489 U.S. 378 (1989)] compels the conclusion here that a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it.").

That Meyers cut a "C" into an inmate's hair while performing a haircut does not make it so obvious that Meyers would physically assault another inmate, even given Meyers' prior assaultive behavior, in light of the seven months of otherwise appropriate behavior by Meyers that a jury could infer from it that Warden Schuetzle was deliberately indifferent to a substantial risk of harm to other inmates from leaving Meyers in the general population. See Hott v. Hennepin County, Minn., 260 F.3d 901, 907-08 (8th Cir. 2001) ("[T]he evidence adduced by the plaintiff is insufficient to support an inference that suicide amounts to such a substantial risk to general inmate safety that Rieder's failure to conduct checks according to ADC policy amounted to deliberate indifference to Hott's needs."); cf. Reece, 60 F.3d at 491 (concluding that risk of assault on inmate who was a known informant and placed in administrative segregation for his own protection was obvious); Krein v. Norris, 309 F.3d 487, 489-90 (8th Cir. 2002) (affirming denial of summary judgment after inmates in open barrack facility fatally attacked another inmate where there was evidence that barrack was understaffed for a period of several months, that violence in the barrack was five times higher than in other barracks, and facility failed to track number and location of assaults in various barracks). "[P]risons 'are not required to segregate indefinitely all inmates whose original crimes suggest they might be capable of further violence.'" Blades v. Schuetzle, 302 F.3d 801, 803-04 (8th Cir. 2002) (quoting Curry v. Crist, 226 F.3d 974, 978 (8th Cir. 2000)). The same is true for inmates who engage in violence while in prison. We must give substantial deference to prison officials to determine the best methods for dealing with dangerous inmates in the volatile environment that is prison life. See Crow v. Montgomery, 403 F.3d 598, 602 (8th Cir. 2005) ("'A prison official's duty under the Eighth Amendment . . . incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody

under humane conditions.'" (quoting <u>Farmer</u>, 511 U.S. at 844-45)). Considering the facts as alleged, Norman has failed to present any evidence from which a fact finder could conclude that Warden Schuetzle was aware of a substantial risk that Meyers would attack another prisoner two months later if he was allowed to remain in the general population following the haircut incident. <u>See</u> <u>Curry</u>, 226 F.3d at 978 (concluding that warden did not violate the Eighth Amendment rights of all prisoners in general population when an inmate with a violent history who made threats to commit mass murder in the prison was allowed into the general population after an extensive period of nonviolent conduct). The district court erred in denying qualified immunity to Warden Schuetzle.

B.    Case Worker Schwehr

Norman claims that Case Worker Schwehr violated his constitutional rights when he failed to take further action to protect him after receiving the information from Case Worker Taylor that Meyers had made statements about fighting Norman. The district court concluded that Schwehr was not entitled to qualified immunity because there was sufficient evidence from which a jury could conclude that Schwehr was aware of a substantial threat to Norman based on Taylor's report, coupled with the events of the night before the attack when Meyers tried to get Schwehr to release Norman for a haircut and sent him the towel. The district court also concluded that although Schwehr took some action when he noted the threat in the logbook and informed his supervisor, it could not say that Schwehr's actions were "reasonably sufficient as a matter of law" to entitle him to qualified immunity. (Add. at 36-37.)

When Schwehr received notice from Taylor that Meyers was joking about fighting with Norman, Meyers was housed in the West Cell House, and Norman was housed in the East Cell House. Thus, Meyers did not have immediate access to Norman to follow through with the threat. Further, Schwehr did not let Norman out of his cell for a haircut as requested by Meyers, further limiting Meyers' access to

Norman. Schwehr notified his supervisor of the threat and the events of the evening, even though he did not believe the threat to be serious, and he noted the threat in the logbook.

A prison official violates an inmate's Eighth Amendment rights only when he is "deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates." Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998) (internal marks omitted). The district court here concluded that Schwehr's actions were not reasonable as a matter of law. But we have noted on numerous occasions that "reasonableness is a negligence standard," id. at 1152, and "mere negligence does not 'support a conclusion that [a prison official] exercised callous disregard or reckless indifference in responding to the risk,'" id. (quoting Bailey v. Wood, 909 F.2d 1197, 1200 (8th Cir. 1990)). In Jackson, the district court had deemed to be insufficient the prison guard's response to an anonymous note that one inmate would kill another one during the night. The guard interviewed the two inmates involved, both of whom denied having an issue with the other, and notified his supervisor the following morning. Although the attack did not occur until later on the following day, the district court concluded that the guard's failure to separate the two inmates (who were bunked next to each other in an open barrack) or check for weapons could be construed as deliberate indifference by a jury. Id. We reversed the denial of qualified immunity, reasoning that "[b]ecause we give prison officials 'wide-ranging deference . . . to preserve internal order and discipline and to maintain institutional security,' [the guard's] failure to take additional security measures, even if arguably negligent, cannot constitute reckless disregard of a known risk." Id. at 1152-53 (quoting Falls v. Nesbitt, 966 F.2d 375, 379 (8th Cir. 1992)).

As was true in Jackson, the prison officials here are given "wide-ranging deference to preserve internal order and discipline and to maintain institutional security." Id. (internal marks omitted). Schwehr did not ignore the threat but proceeded to notify his supervisor and logged it in the logbook. Schwehr's failure to

take additional security measures may not have been the best judgment call in hindsight, but given the circumstances known to Schwehr at the time, see Blades, 302 F.3d at 804 ("[T]he matter of deliberate indifference must be determined with regard to the relevant prison official's knowledge at the time in question, not with hindsight's perfect vision." (internal marks omitted)), we cannot say that Schwehr engaged in unconstitutionally cruel and unusual punishment when he noted the threat in the logbook and contacted his supervisor but did no more, see Tucker, 276 F.3d at 1002 ("The alleged conduct certainly points to negligence, and quite possibly even gross negligence, but that is insufficient to prove a violation of Tucker's constitutional rights."); Jackson, 140 F.3d at 1153 ("[A prison guard's] failure to take additional security measurers, even if arguably negligent, cannot constitute reckless disregard of a known risk."); see also Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines . . . . The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." (internal marks and citations omitted)).

C.    Case Worker Materi

Taking the facts most favorably to Norman, Case Worker Materi was informed two weeks prior to the assault by an inmate that "some black guy" was looking to hire someone to assault Norman. On the morning of the assault, Materi reported for work at 5:30 a.m. and attended a briefing until 6:00 a.m. Meyers assaulted Norman at 6:20 a.m. If Materi saw the logbook entry at 5:30 a.m. when she signed in, a fact we take as true on the disputed record,[2] she also would have seen that Schwehr notified his

---

[2]Materi filed an affidavit stating that although she noted in the logbook at 5:30 a.m. that she had reviewed the log, morning roll-out was a very busy time and, as was common, she did not actually review the logbook until after roll-out was taken care of and after Meyers' assault on Norman, such that she did not see Schwehr's note in the logbook about the possibility that Meyers may attack Norman prior to the attack.

Lieutenant of the threat. It is undisputed that Materi routinely arrived at work approximately an hour later than other staff members, who were separately briefed each morning by a captain or a lieutenant. The district court denied qualified immunity to Materi, concluding that a jury could find from her initials in the logbook that she had seen Schwehr's entry when she first logged in at 5:30 a.m. and therefore was subjectively aware of a substantial risk of harm to Norman. The district court also found that a jury could conclude that there was more that Materi could have done to protect Norman and that it was unreasonable for Materi to have relied on the log entry to notify others who had direct supervision of Meyers of his threat against Norman.

As with Schwehr, we cannot say that Materi's actions, or lack thereof, amounted to more than negligence. "'[D]eliberate indifference includes something more than mere negligence but less than actual intent to harm;' it requires proof of a reckless disregard of the known risk." Jackson, 140 F.3d at 1152 (quoting Newman v. Holmes, 122 F.3d 650, 653 (8th Cir. 1996)). Even if Materi made a connection between the log entry–which stated only that Meyers "may assault" Norman with no indication of when, where, or how–and the vague information she received two weeks earlier that "some black guy" was looking for someone to assault Norman, the log entry also told Materi that one supervisor had already been notified of Meyers' threat.

While doing nothing could be viewed as deliberately indifferent or callous, Materi's lack of action must be considered in the context of what was going on at the time, viewing the submitted evidence in the light most favorable to Norman. Prior to the day of the attack, Materi knew only that an inmate told her someone was looking to assault Norman. She arrived at the facility at 5:30 a.m. on the day of the assault, viewed the logbook and saw that Meyers "may assault" Norman, and also saw that a

The district court concluded that a jury may disbelieve Materi's claim based on her initials in the logbook. We do not weigh into this factual debate.

-14-

Lieutenant had been notified of that possibility the evening before. She attended a briefing from 5:30 a.m. to 6:00 a.m. She was then required to monitor inmates in the East Cell House during the busy time of "roll-out" when inmates were let out of their cells for showering, breakfast, and getting ready for their prison jobs, which ended around 6:45 a.m. Materi was one of three staff in the East Cell House during that time, one stationed on each of the three tiers, and she was not allowed to leave the East Cell House during that time. (Appellants' App. at 44.)

The issue comes down to whether Materi's lack of action between the time she initialed the logbook at 5:30 a.m., arguably learning of the threat, and the time that Meyers assaulted Norman less than an hour later at 6:20 a.m., rises to the level of deliberate indifference to that known risk. The record is vague about what Materi could have done at that time. The district court speculates that Materi could have locked Norman in his cell or started an investigation, citing to Materi's affidavit, wherein she stated that "[h]ad [she] had any valid information about a planned assault on Norman [she] would have immediately began an investigation." (Appellants' App. at 44.) That statement was in reference to the inmate's report to her that someone was looking to hire an assault on Norman two weeks prior to the incident. The district court ignored the undisputed evidence contained later in her affidavit explaining that she could not have left her post during the busy roll-out time and that other officers with responsibility for monitoring Meyers would have been notified during their briefing of the threat. Even if they were not briefed, we cannot say it was unreasonable for Materi to conclude that they had been briefed. These facts are simply inadequate to permit a jury to conclude that Case Worker Materi was deliberately indifferent to a known threat of an attack on Norman. Farmer, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

D.    Director of Education Wrolstad

Norman's claim against Wrolstad is different from his claims against the other prison officials, whom he alleges were deliberately indifferent to a known risk that Meyers would assault Norman. Norman's claim against Wrolstad alleges an intentional action by Wrolstad based on his theory that Wrolstad took the kites that Norman had written complaining about the restaurant class and showed them to other inmates in an attempt to incite the other inmates to retaliate against Norman. Norman has provided sufficient evidence from which a jury could infer that Wrolstad provided the kites to other inmates. There is no evidence, however, that Wrolstad did anything to incite the other inmates against Norman beyond showing them the kites. While we construe the evidence in the light most favorable to Norman, we do not engage in speculation. See Brown, 518 F.3d at 558; see also Levine v. Roebuck, 550 F.3d 684, 688 (8th Cir. 2008) (refusing to consider as fact the district court's inference that a prison official ordered an involuntary catheterization where the inference was not supported by the record).

"[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). Although we have stated that "[t]he Supreme Court has 'changed the clearly established law inquiry from a hunt for prior cases with precisely the same set of facts to asking whether the official had fair notice [his or] her conduct was unconstitutional,'" Bonner v. Outlaw, 552 F.3d 673, 679 (8th Cir. 2009) (quoting Lindsey v. City of Orrick, Mo., 491 F.3d 892, 902 (8th Cir. 2007)), the caselaw must still be such as to put an officer on fair notice that his actions are unconstitutional. Thus, in Bonner, prior caselaw holding that an inmate was entitled to notice when a letter addressed to the inmate was rejected by the prison put prison officials on notice that an inmate was entitled to the same notice when a package was rejected. Id. at 680 ("There is no valid reason for distinguishing between letters and packages: the inmate's liberty interest is the same and there is no additional

administrative burden involved."); see also Brown, 518 F.3d at 561 (holding that an officer was on notice that driving recklessly while transporting a shackled inmate who was denied use of a seatbelt violated the inmate's constitutional rights based on prior unpublished caselaw involving an officer transporting an inmate in the back of his car who refused to let the inmate wear a seatbelt and drove at a high rate of speed in bad weather); Lindsay, 491 F.3d at 902 (holding that prior cases holding that a public employer cannot fire an employee for disclosing potentially illegal conduct by public officials put an employer on notice that it could not fire an employee after speaking out on City's perceived violation of open meeting laws); Hill v. McKinley, 311 F.3d 899, 904 (8th Cir. 2002) (holding that it was not clearly established that strapping an inmate to a restraint board while naked violated her constitutional right to privacy in spite of cases holding that prison officials must balance an inmate's privacy rights against security concerns in light of other cases holding that prisoners have no general right not to be seen naked by guards of the opposite sex).

In analyzing a claim of qualified immunity, we therefore look at the specific actions of the officer to determine whether it was clearly established that his actions violated the inmate's rights. See Pearson, 129 S. Ct. at 822-23 (characterizing the legal issue narrowly). In Pearson, the district court granted qualified immunity to the arresting officers on the basis that the officers, who made an unwarranted search of the defendant's home after their confidential informant signaled that he had completed a drug transaction with the defendant, could reasonably have believed that the consent-once-removed doctrine authorized their conduct. The Tenth Circuit reversed, holding that the consent-once-removed doctrine, which had been applied by courts only to undercover officers, did not extend to confidential informants. The appeals court further concluded that it was clearly established that an unwarranted entry into an individual's home violated the Fourth Amendment unless it met the consent or exigent circumstances exceptions, which did not apply to the facts of the case. Id. at 814-15. On certiorari to the Supreme Court, the Court framed the legal issue of what must be clearly established much more narrowly, id. at 822 (discussing the state of the

law surrounding the consent-once-removed doctrine at the time of the officers' actions), and held that the officers were entitled to qualified immunity because "the unlawfulness of the officers' conduct in this case was not clearly established," id. at 823.

Following the Supreme Court's lead then, we must determine whether Wrolstad was on fair notice in the spring of 2005 that his actions of allowing the other inmates to view Norman's kites complaining about how Wrolstad ran the restaurant class would unreasonably subject Norman to a threat of substantial harm at the hands of the other inmates. Norman argues that Wrolstad's actions are akin to labeling him a snitch, which, subsequent to the events at issue here, our circuit held violates an inmate's constitutional rights. See Irving, 519 F.3d at 451 (concluding that "notwithstanding the lack of a decision squarely on point within our circuit," a prison official is "on fair notice that to falsely label an inmate a snitch is to unreasonably subject that inmate to the threat of a substantial risk of serious harm at the hands of his fellow inmates"). In Irving, we held that even though we had never determined that the act of labeling an inmate a snitch was itself actionable under the Eighth Amendment, it was clearly established at that time that such action would unreasonably subject the inmate to a substantial risk of harm from other inmates based on our own caselaw concluding that an inmate who was labeled as a snitch was in danger of assault by other inmates and caselaw from other circuits holding that a prison official violates his duty to protect an inmate from harm when he labels the inmate a snitch to other inmates. Id.

The prison guard in Irving did more than label the inmate a snitch; he threatened to kill the inmate or have him killed, and he made three unsuccessful offers of payment to inmates to assault the targeted inmate, even arming one inmate with a razor blade. In contrast, Norman alleges only that Wrolstad showed the kites Norman had written complaining about the restaurant program to other inmates in the hopes that they would "do his dirty work." There is no evidence that Wrolstad verbalized

-18-

his hopes that someone would "do his dirty work" or take care of Norman. In fact, the only evidence presented is that Wrolstad told inmates that it was not worth losing their privileges over Norman. In any event, Irving was decided long after the events involved here and could not have put Wrolstad on notice that actions analogous to labeling an inmate a snitch violate the inmate's constitutional rights.

Further, we do not believe Wrolstad's actions are sufficiently analogous to labeling an inmate a snitch that he was on notice from the snitch cases that his actions placed Norman at a substantial risk of harm. Wrolstad did not label Norman a snitch, a term that is recognized as creating an obvious risk of danger to inmates. See Reece, 60 F.3d at 491 (noting that the fact that Reece faced a substantial risk of harm was obvious from the fact that he was a known snitch, which placed him at a substantial risk of injury by his fellow inmates, and had testified for the prosecution in a murder trial); cf. Wolff v. McDonnell, 418 U.S. 539, 562 (1974) ("Relationships among the inmates are . . . perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner. . . . The reality is that disciplinary hearings . . . necessarily involve confrontations . . . between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility . . . ."). Labeling an inmate a "snitch" informs other prisoners that the inmate has gotten other inmates in trouble, and the cases are replete with the harm that comes from being labeled a snitch. In contrast, Norman complained about a prison official, not another inmate, so that he was not in danger of retaliation by an inmate. Further, it is undisputed that Norman himself complained to other inmates about the way Wrolstad ran the restaurant program, so that Wrolstad's actions did not place Norman in any greater danger than he created for himself. The evidence also reveals that Norman did not fear that Wrolstad's actions placed him in danger; when Norman filed grievances complaining that Wrolstad showed his kites to other inmates, he did not seek protection from those inmates, even though he admitted at the January 16, 2008, telephonic hearing that he knew before he filed the June 28, 2005, kite that Meyers and another inmate had seen the kites and discussed

what should be done about them. (Add. at 11.) Rather, Norman requested only that Wrolstad be fired for his actions. If Norman did not fear that Wrolstad's actions placed him in danger, it cannot be said that Wrolstad was on fair notice that he was placing Norman at a substantial risk of harm. See Pagels, 335 F.3d at 740 (concluding that a letter by an inmate that discussed threats made by other inmates but did not request protection and stated that the inmate's purpose for writing the letter was to disavow ownership of contraband in his cell did not put an officer on notice of a credible threat of violence against the inmate).

Existing caselaw in 2005 did not sufficiently put Wrolstad on notice that his actions of showing the kites to other inmates put Norman at a substantial risk of harm from other inmates. Norman fails to cite to cases other than the snitch labeling cases to support his claim that it was clearly established that Wrolstad's actions violated his constitutional rights. As in Pearson, we look to the specific actions of the officer to determine whether it was clearly established that his actions violated the inmate's rights. We conclude that whether or not it violated Norman's right to be protected from harm when Wrolstad showed his grievances to other inmates under the circumstances of this case, it was not clearly established at the time that doing so would have violated Norman's rights. See Pearson, 129 S. Ct. at 819 (explaining that it may be better to address the second Saucier prong of whether a right is clearly established without first addressing whether there was a constitutional violation where "the constitutional question is so fact-bound that the decision provides little guidance for future cases").

III.

The district court's judgments denying qualified immunity are reversed as to each appellant, and the cases are remanded to the district court for entry of summary judgment for each of the appellants.

BYE, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's decision reversing the district court's denial of qualified immunity to Warden Tim Schuetzle. I dissent, in part, because, based on the facts as alleged by James Norman, a reasonable jury could conclude the remaining appellants violated the Eighth Amendment's prohibition against cruel and unusual punishment.

"[T]he eighth amendment's prohibition against cruel and unusual punishment requires prison officials to 'take *reasonable* measures to guarantee' inmate safety by protecting them from attacks by other prisoners." Young v. Selk, 508 F.3d 868, 871-72 (8th Cir. 2007) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994) (emphasis added)). Prison officials act unreasonably – thereby violating the Eighth Amendment – when they are "deliberately indifferent to a 'substantial risk of serious harm.'" Id. at 872 (quoting Farmer, 511 U.S. at 828). To prove deliberate indifference, an inmate must make a two-part showing: "The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious. The second requirement is subjective and requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.'" Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008) (quoting Farmer, 511 U.S. 834) (internal citation omitted). The deprivation is "'objectively, sufficiently serious,' [under the first requirement when] the official's failure to protect resulted in the inmate being 'incarcerated under conditions posing a substantial risk of serious harm.'" Young, 508 F.3d at 872 (quoting Farmer, 511 U.S. at 834). "An official is deliberately indifferent [under the second requirement] if he or she actually knows of the substantial risk and fails to respond *reasonably* to it." Id. at 873 (citing Farmer, 511 U.S. at 844-45) (emphasis added).

When considering the first requirement, the assailant's conduct can provide us "the most probative evidence of the degree and type of risk that [the inmate] faced." Id. at 872. When viewed in the light most favorable to Norman, evidence of Michael

Meyers's conduct shows a substantial risk of serious harm to Norman existed. Meyers's past conduct proved conclusively he was prone to violent, assaultive behavior. In the two-year period prior to the assault on Norman, Meyers had been administratively sanctioned for five assaultive incidents. He had been removed to administrative segregation and required to undergo anger management training. Meyers completed his punishment and was released back into general population, but after returning to general population, Meyers, who worked as a prison barber, cut the letters "cho" into an inmate's hair identifying him as a child molester. In a prison population child molesters are viewed with disdain and Meyers's desire to openly brand another inmate, thereby exposing him to a serious risk of violent assault, demonstrates he continued to pose a significant threat to other inmates.

It is with this background in mind that Meyers's threats against Norman have to be evaluated to determine if Norman faced a substantial risk of serious harm. Approximately two weeks before Meyers attacked Norman, Mary Materi was told about "some black guy [who] was looking to hire someone to beat up Norman." Additionally, Dan Wrolstad, the prison's educational director, was aware several inmates were angry at Norman and considering action against him. A day prior to the assault, Brian Taylor, a correctional officer assigned to the cellblock where Meyers was housed, called Marc Schwehr, who worked in Norman's cellblock, informing him Meyers was threatening to attack Norman.[3] Shortly after receiving the call from Taylor, Meyers attempted to convince Schwehr to let Norman out of his cell for a haircut. The district court found evidence the request was made under suspicious

_____

[3]The majority minimizes the seriousness of the threats by adopting Taylor's claim that "Meyers was joking about fighting with Norman . . . ." Ante, at 11. When reviewing the denial of qualified immunity we consider the evidence in the light most favorable to the non-moving party, Irving, 519 F.3d at 446, and the majority's characterization of Meyers's threats as "joking" is not supported by the evidence. Meyers's past violent behavior, his threats against Norman, his attempts to gain access to Norman the evening before the assault, and the attack on Norman all clearly indicate Meyers was not joking.

circumstances because "Norman was on cell confinement for the evening and Schwehr understood that persons on cell confinement were not allowed out for a haircut, but Meyers attempted to convince him that the policy had changed." Later, Meyers had a towel delivered to Norman in a further attempt to lure him out of his cell. In response to Meyers's threats against Norman and his attempt to lure Norman from his cell, Schwehr notified his superior and placed a warning in the logbook indicating Meyers may assault Norman. Finally, Norman states Schwehr told him it looked as if "someone was out to get him."

Based on this evidence, it is objectively apparent Norman faced a substantial risk of serious harm. As early as two weeks before the attack an inmate was soliciting other inmates to assault Norman, and Meyers, who had proven himself a threat to other inmates on numerous occasions, agreed to do the job. The day before the assault, Meyers openly threatened to attack Norman and attempted to have him released from his cell to facilitate the attack. The fact that Schwehr advised his superior, refused to release Norman from his cell, placed a written warning in the logbook memorializing the threats, and warned Norman all strengthen the conclusion about the danger to Norman being very real.

When considering the second requirement, we ask whether Norman has presented sufficient evidence of the subjective aspect of his Eighth Amendment claim. "To meet this requirement, [Norman must] show that the defendants exhibited a sufficiently culpable state of mind, that is, [they] must have been deliberately indifferent to the substantial risk of serious harm to [Norman]." Young, 508 F.3d at 873 (citation and internal quotation marks omitted). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond *reasonably* to it." Id. (citing Farmer, 511 U.S. at 844-45) (emphasis added). "The question of whether the official knew of the substantial risk is a factual one 'subject to demonstration in the usual ways, including inference from circumstantial evidence.'" Id. (citing Farmer, 511 U.S. at 842). Norman need not show "that a prison

official acted or failed to act believing harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842. Moreover, "in order to have a viable deliberate indifference claim, a plaintiff is *not* required to allege and prove that the defendant . . . specifically knew about or anticipated the precise source of the harm." Kahle v. Leonard, 477 F.3d 544, 551 (8th Cir. 2007) (emphasis in original (quoting Krein v. Norris, 309 F.3d 487, 491 (8th Cir. 2002)).

I conclude Norman's evidence is sufficient to avoid summary judgment on the subjective component of his Eighth Amendment claim. As previously noted, inmate Meyers had a long history of violent assaultive behavior. On the evening before he assaulted Norman, Meyers told Taylor he intended to assault Norman and Taylor forwarded the threats on to Schwehr. Schwehr contends Taylor characterized Meyers's threats as "joking" and downplays their seriousness. On such a record, I conclude, unlike the majority, that the import of Meyers's threats cannot be minimized when determining if summary judgment was appropriate. Schwehr's own words and actions undermine his self-serving claim he subjectively viewed the threats as incredible. After Taylor informed Schwehr of Meyers's threats against Norman, Meyers tried to talk Schwehr into releasing Norman from his cell. In his affidavit, Schwehr suggests he had no idea why Meyers wanted Norman out of his cell. Incredibly, he disregards the most obvious reason – to facilitate the threatened assault on Norman. Despite Schwehr's convenient omission in his affidavit, his actions at the time indicate he took the threats seriously. His affidavit confirms his suspicions and he did not believe Meyers's proffered reasons for wanting access to Norman: "I did not know whether Meyers [sic] request was an attempt by Meyers to get Norman out of his cell so Meyers could give Norman a haircut, to talk to him, to buy something for him, or any number of other possible reasons." Indeed, because of the threats and the "towel incident" Schwehr refused to release Norman from his cell. Instead, he notified his superior and made a notation in the logbook warning of a possible assault. Schwehr also told Norman: "It looks like someone is trying to set you up."

-24-

Schwehr was made expressly aware that Meyers, an inmate with a long history of violence, was threatening to attack Norman. Schwehr was also aware of Meyers's suspicious attempts to have Norman released from his cell. Having been made aware of the substantial risk of serious harm to Norman, Schwehr's duty under the Eighth Amendment was "to take reasonable measures to abate it." Farmer, 511 U.S. 848 ("[A] prison official may be held liable under the Eighth Amendment . . . only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."); see also Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996) ("[An inmate's] pleadings must demonstrate that the prison officials failed to act reasonably despite knowledge of a substantial risk of serious harm . . . ."). I conclude, as did the district court, Schwehr actually knew of the substantial risk to Norman but recklessly disregarded the known risk by failing to take reasonable measures to protect him. As a threshold matter, before addressing the unreasonableness of Schwehr's actions, I first address the majority's misapprehension of controlling precedent.

In direct contravention of controlling Supreme Court precedent, the majority bushes aside the evidence and holds Schwehr was not required to act reasonably in response to his subjective knowledge of the substantial risk of serious harm to Norman. "[W]e have noted on numerous occasions that reasonableness is a negligence standard, and mere negligence does not support a conclusion that [a prison official] exercised callous disregard or reckless indifference in responding to a risk[.]" Ante, at 12 (internal quotation marks and citation omitted). The majority states:

> Schwehr's failure to take additional security measures may not have been the best judgment call in hindsight, but given the circumstances known to Schwehr at the time we cannot say that Schwher engaged in unconstitutionally cruel and unusual punishment when he noted the threat in the logbook and contacted his supervisor but did no more.

-25-

<u>Ante</u>, at 13 (internal citations omitted).  Instead of measuring Schwehr's attempts to abate the risk to Norman against a reasonableness standard, the majority holds Norman cannot prevail unless Schwehr acted recklessly.  This is quite simply wrong.

To be sure, the legal concept of "recklessness" is germane to this discussion.  It is not, however, the standard by which Schwehr's *actions*, after he became aware of the substantial risk of serious harm to Norman, are judged.  The Supreme Court has clearly and repeated stated an official must act *reasonably* to abate such harm.  Recklessness, as used by the Supreme Court, speaks to the official's deliberately indifferent *state of mind*.  "[D]eliberate indifference describes a *state of mind* more blameworthy than negligence."  <u>Farmer</u>, 511 at 835 (emphasis added).  As such, an official's state of mind is not relevant to whether he *acted* reasonably in response to the known risk, but rather whether his *disregard* of the risk was done recklessly or with deliberate indifference.  In other words, "subjective recklessness . . . [is] the test for 'deliberate indifference' under the Eighth Amendment."  <u>Id.</u> at 839-40.  "[T]o act recklessly . . . a person must 'consciously disregar[d]' a substantial risk of serious harm."  <u>Id.</u> at 839 (citing Model Penal Code § 2.02(2)(c)).  Nowhere has the Supreme Court suggested an official's actions, taken in response to a known substantial risk of serious harm, are to be judged by a recklessness standard.  To the extent this court's precedent may hold otherwise, it is of no consequence and must yield to the Supreme Court's most clear pronouncements.

Turning now to an analysis of Schwehr's actions, I conclude he failed to act reasonably to abate the risk to Norman.  As noted, despite Meyers's proven propensity for violence, Schwehr did not take the threats against Norman seriously.  Schwehr's casual attitude towards a violent inmate's threats of violence against another inmate and his attempts to gain access to the inmate, constitute a deliberate disregard of a substantial risk of serious harm.  In response to this known risk, Schwehr states he informed his supervisor as to Meyers threatening to attack Norman.  He neglects, however, to share the identity of the supervisor (beyond indicating it was an

-26-

unidentified lieutenant) or to tell the court what, if any, actions he was instructed to take.[4] Such information is vital to any inquiry into the reasonableness of his actions, and the failure to provide it precludes any meaningful evaluation of Schwehr's conduct. All we know is he claims to have made a telephone call, which, as a matter of law, cannot be adjudged reasonable under the circumstances. If Schwehr was instructed to take further action but disregarded those orders, he acted unreasonably. Similarly, if Schwehr was instructed to and did ignore the known risk, he also acted unreasonably. The only other action Schwehr took was to make a notation in the cellblock logbook indicating "Meyers, Michael . . . may assault Norman, James." Schwehr undertook no investigation of the threats, did not speak with other on-duty officers about the threats, and did not inform Norman about Meyers threatening him. Based on this evidence, I have no trouble concluding a jury could find Schwehr failed to take reasonable actions once he became aware of the substantial risk of serious harm to Norman. I also note the majority, though it mistakenly measures Schwehr's actions by a recklessness standard, also concludes Schwehr exercised poor judgment.

I further conclude the evidence supports Norman's claim as to Materi recklessly disregarding the substantial risk of serious harm Meyers posed to him. The morning after Meyers threatened Norman and attempted to gain access to him, Materi, who two weeks earlier had been informed of threats against Norman, came on duty at 5:30 a.m. at Norman's cellblock. She denies actually reading the logbook containing Schwehr's notation regarding Meyers's threats against Norman, but her denial is contradicted by a notation she made indicating she read it upon arriving at work. Despite this knowledge, which we must assume, Materi took no action to protect Norman and the assault occurred at approximately 6:20 a.m. The majority concludes Materi was too busy to take any action to protect Norman, including conferring with other prison staff

---

[4]Notably, the district court ordered Schwehr to produce any written reference or note documenting a contact between Schwehr and the unidentified lieutenant and none was produced. Nor has Schwehr provided an affidavit from the mystery lieutenant.

members or locking Norman in his cell until such time as she could properly investigate the threats. A jury, however, might readily conclude it was unreasonable for Materi to do nothing. The majority excuses Materi's inaction by concluding she was reasonable in assuming the matter had been communicated to other staff members. Assuming other staff members had been briefed about the threats, they were not privy to the additional information Materi had received two weeks earlier which corroborated the threats outlined in the logbook. The immediate and specific threats by Meyers, coupled with the information conveyed to Materi earlier, substantially increased the credibility of the risk to Norman. It was, therefore, unreasonable for Materi to withhold information critical to a full and accurate assessment of the situation and to take no action to prevent the assault.

Finally, the majority disregards Materi's statement indicating if she "had any valid information about a planned assault on Norman [she] would have immediately began an investigation." The majority finds the statement has no probative value because it was made in reference to the information Materi received two weeks earlier about an inmate attempting to hire someone to attack Norman. I find this reasoning curious. Materi stated upon receipt of valid information concerning a planned assault an investigation should immediately be started. Her belief as to what steps should be undertaken in such circumstances is directly relevant to whether she acted reasonably to protect Norman. Unlike the majority, I find no basis for discounting Materi's account of proper procedure simply because it referenced an incident which predated the assault on Norman. A jury, based on Materi's statement, would almost certainly conclude on the day Norman was assaulted she held the same understanding of what procedures to follow in the event a credible threat against an inmate was received.

I also disagree with the majority's decision granting qualified immunity to Dan Wrolstad on the basis of Norman's asserted constitutional right as not being clearly established.

In early 2005, Norman began complaining to Warden Tim Schuetzle about a restaurant class offered through the prison education department. In particular, Norman complained about funding for the class and accused Wrolstad, the prison's education director, of misusing government funds. These complaints followed earlier complaints by Norman accusing Wrolstad of other misdeeds. While his complaints regarding the class were pending, Norman filed another complaint with Schuetzle contending Wrolstad had given a copy of his complaints to other inmates and in doing so was attempting to incite them to retaliate. Schuetzle instructed Wrolstad he should not disseminate inmate grievances among other inmates. According to Norman, his complaints could have caused some class activities to be eliminated which would have angered inmates taking the class. He further alleges, Wrolstad gave the complaints to other inmates out of a desire to retaliate for the recent and earlier grievances filed against Wrolstad.

To prove his allegations against Wrolstad, Norman offered the affidavits of two inmates. One inmate indicated he observed another inmate enter a classroom carrying nothing, and later leave the room carrying a piece of paper. According the affidavit, Wrolstad and the other inmate were the only two people in the room. The affiant further stated the other inmate came into the room he was in and showed him the paper which was a copy of Norman's grievance. The inmate then discussed the grievance with the affiant and another inmate, including what actions should be taken against Norman.

A second inmate offered a similar affidavit, indicating he saw a piece of paper, overheard the conversation about retaliating against Norman, but was unable to actually read the document.

Finally, Norman offered an affidavit submitted by Wrolstad to the warden in response to one of Norman's grievances. In it Wrolstad denied showing the grievance

to any inmates but conceded he was aware inmates were angry and complaining about Norman's activities.

The majority concedes Norman has presented sufficient evidence from which a jury could infer Wrolstad provided copies of Norman's grievances to other inmates. The majority nonetheless concludes Wrolstad's actions did not violate Norman's clearly established constitutional rights. I must respectfully disagree.

Norman's pro se complaint alleges:

> Mr. Wrolstad purposely passed my confidential letter and grievances around to inmates in his dept. as a retaliatory action in hopes of getting me to stop requesting information from him and the way things were being run in his dept.. And Mr. Wrolstad's disregard to my confidential rights have lead [sic] to the recent assault on me.

Appendix of Appellee, p. 16.

Construing the complaint liberally, Estelle v. Gamble, 429 U.S. 97, 106 (1976) (holding a pro se complaint must be liberally construed), Norman has alleged Wrolstad's actions were taken in retaliation for grievances Norman filed against Wrolstad. A prisoner's right under the First Amendment to petition for redress of grievances under a prison's grievance procedures is clearly established in our court. See Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) ("[T]he First Amendment right to petition for redress of grievances includes redress under established prison grievance procedures."). Similarly, it has for twenty years been the law of this circuit that actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983. Id. (citing Franco v. Kelly, 854 F.2d 584, 589-90 (2d Cir. 1988)). The right to be free from retaliation for availing one's self of the prison grievance process is also clearly established in other circuits. See, e.g., Rivera v. Senkowski, 62 F.3d 80, 86 (2d Cir. 1995) ("[A]n inmate's right to be free of retaliation

-30-

for filing grievances was in 1990 and 1991 a clearly established statutory or constitutional right [] of which a reasonable person would have known.") (internal quotation marks and citation omitted); Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995) (holding it is unconstitutional for a prison official to retaliate against an inmate for filing a grievance); Noble v. Schmitt, 87 F.3d 157, 162 (6th Cir. 1996) (holding retaliation directed against an inmate for filing a grievance violates clearly established constitutional law); and Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003) ("The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech.").

To prevail on a claim of retaliation, a prisoner must show 1) he engaged in a protected expression, 2) he suffered an adverse action, and 3) the adverse action was causally related to the protected expression. See Higdon v. Jackson, 393 F.3d 1211, 1219 (11th Cir. 2004). The first prong presents no barrier to Norman's retaliation claim. He alleges Wrolstad's actions were taken in response to grievances Norman filed, and access to the grievance process is protected under the First Amendment.

As for the second prong, Norman alleges Wrolstad distributed copies of his grievances to other inmates to put them on notice as to Norman's complaints possibly leading to the cancellation of an inmate cookout planned as part of a restaurant management class. He further alleges the affected inmates would be angered – to the point of taking action against him – by the prospect of being deprived of the much-anticipated outing. To prove he suffered an adverse action, Norman offers a response from Warden Schuetzle to one of his grievances indicating it was a violation of prison policy to distribute an inmate's grievances to other inmates and Wrolstad should not be showing Norman's grievances to other inmates. Additionally, he offers an affidavit from Wrolstad indicating several inmates were upset by Norman's attempts to sabotage the inmate cookout. As noted by the district court, Wrolstad's decision to distribute Norman's grievances to other inmates must be evaluated against the backdrop of prison life. "[W]e are not dealing here with a population of entirely

reasonable and rational persons. Moreover, it is conceivable that prisoners may get upset about what otherwise are trivial matters, particularly those that might provide temporary respite from the boredom of prison life." Assuming, as we must, that Wrolstad disclosed the content of Norman's grievances to inmates whose interests stood to be adversely affected, the evidence shows Wrolstad's actions violated prison policy. A reasonable jury could conclude Wrolstad was aware of prison policy and his decision to violate the policy is evidence he intended to anger and incite the other inmates. Such a conclusion is especially reasonable in light of the fact that Wrolstad has offered no legitimate reasons for his violation of prison policy. Furthermore, in his affidavit Wrolstad acknowledges he was aware the other inmates were angry and discussing what action they should take in retaliation against Norman.

After carefully reviewing Norman's allegations and the evidence offered to support his claims, I cannot accede to the majority's conclusion finding no evidence to suggest Wrolstad intended to incite other inmates against Norman. The mere fact Wrolstad disclosed the information in direct violation of prison policy, without offering any legitimate reasons for having done so, counsels against such a conclusion. A prison policy prohibiting the dissemination of confidential information contained within inmate grievances serves the purpose of preventing sensitive, potentially volatile, information from coursing through the nether world of prison life. The unique mischief that disclosure of such information may advance within a prison's walls would be readily apparent to any reasonable prison official. Therefore, under the facts as alleged, Wrolstad was on fair notice his conduct was unconstitutional. Bonner v. Outlaw, 552 F.3d 673, 679 (8th Cir. 2009). Accordingly, I conclude Norman has presented sufficient evidence from which a jury could conclude Wrolstad, with retaliatory intent, disclosed the contents of Norman's grievances to other inmates for the purpose of provoking them to take action against Norman.

Finally, Norman has also offered sufficient evidence to prove the disclosure of his grievances and resulting attack were causally related to the exercise of his First

Amendment right. Norman filed multiple grievances complaining about Wrolstad's management of the prison's educational program. The complaints sought to curtail or eliminate elements of the program, alleged misconduct by Wrolstad, and demanded his dismissal. In the absence of any other explanation, a jury could reasonably conclude Wrolstad's violation of prison policy was undertaken with a retaliatory motive. Additionally, Norman's evidence shows the inmates to whom the information was disclosed plotted to take action against him for jeopardizing the inmate cookout. Two weeks prior to the assault, Materi was informed an inmate was soliciting other inmates to attack Norman. The evening before the assault Meyers threatened to attack Norman and attempted to have Norman released from his cell. Finally, an eye-witness to the assault stated it appeared to have been planned in advance and was not the result of a mutual disagreement between Norman and Meyers.

In summary, I concur in the majority's decision reversing the district court's denial of qualified immunity to Warden Schuetzle. I respectfully dissent from Parts II.B, II.C, II.D, and III of the opinion because, based on the facts as alleged, a reasonable jury could conclude the remaining appellants violated the Eighth Amendment's prohibition against cruel and unusual punishment focused upon prison inmate James Norman.

_____