# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3883

_____

| | | |
|---|---|---|
| Kenneth Brian Young, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Sergeant Selk; Sergeant Coolidge, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: September 27, 2007
Filed: November 28, 2007

_____

Before COLLOTON, ARNOLD, and GRUENDER, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Prisoner Kenneth Young brought an action against the Minnesota Department of Corrections (MDOC) and its officials under 42 U.S.C. § 1983, claiming that they violated the eighth amendment's prohibition against cruel and unusual punishment by failing to protect him from an assault by his roommate. His complaint also included an assault claim against his attackers. When MDOC and the prison officials moved to dismiss the claims against them, the district court,[1] treating the motion as one for

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, adopting the report and recommendations of The Honorable Susan Richard Nelson, United States Magistrate Judge for the District of Minnesota. *See* 28

summary judgment, granted the motion in part. It denied the motion, however, as to Mr. Young's eighth amendment claims against Sergeant Van Coolidge and Sergeant Charles Selk in their individual capacities. The two prison employees appealed, contending that the district court should have dismissed these claims based on qualified immunity. We affirm.

## I.

Though Sergeants Selk and Coolidge moved to dismiss, both they and Mr. Young in his response relied on matters outside the pleadings. The district court thus properly treated the motion as a request for summary judgment. *See* Fed. R. Civ. P. 12(b). The denial of summary judgment based on qualified immunity is immediately appealable, and we review it *de novo*. *See Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000). We state the facts as viewed in the light most favorable to Mr. Young, drawing all reasonable inferences in his favor. *See Burnham v. Ianni*, 119 F.3d 668, 673 (8th Cir. 1997) (en banc).

A few months after Mr. Young was incarcerated at the Rush City facility of MDOC (MDOC-RC), inmate Edward Whitefeather was placed in the cell with him. When Mr. Whitefeather arrived, Mr. Young said, "Hi" and offered to move his possessions out of Mr. Whitefeather's way because the room was small. Mr. Whitefeather did not respond.

Mr. Young next told Mr. Whitefeather that since he (Mr. Young) worked during the day, Mr. Whitefeather would have the room to himself. He added that he would appreciate it if Mr. Whitefeather kept the television volume down when Mr. Young came back during his lunch break so that he could get some "nap time," and that the room was otherwise "basically his" (Mr. Whitefeather's). Mr. Whitefeather then "went off the deep end about you don't tell me what to do or anything else [and]

U.S.C. § 636(b)(1)(B).

-2-

started talking about he's got friends."  When Mr. Young said that he had intended to talk about these things "out of respect," Mr. Whitefeather said "well, mother fuck you, and everything else."  Finally Mr. Whitefeather said that he would do whatever he wanted to do and that if Mr. Young didn't like it, he would have to "deal" with Mr. Whitefeather and his "boys."

After waiting about twenty minutes so as not to arouse Mr. Whitefeather's suspicions, Mr. Young left the room to seek assistance.  Because he was new to that particular area of MDOC-RC, Mr. Young asked inmate Brian Brown – who had worked in the unit for some time as a janitor – whom he should talk to about moving to another cell.  After introducing Mr. Young to Sergeant Coolidge at the guard desk, Mr. Brown told the sergeant that Mr. Young was having a problem with his roommate, who was of a different race, adding that "there is something wrong with the dude."  When Sergeant Coolidge asked Mr. Young what the problem was, he responded that Mr. Whitefeather was "deranged" and had threatened him.  Mr. Young added, "You gotta get me out of this room.  I don't want to be in a situation.  I don't want no problems with the guy."  He asked "please" to be moved from the room "immediately" and offered to start packing up his things.

When asked to recount the conversation more specifically, Mr. Young testified that Sergeant Coolidge said something like " 'I'll try to get back to you as soon as I can' or whatever guards do to blow you off.  I said, 'well, it's pretty urgent.' "  When the sergeant suggested that Mr. Young write a kite (a prison form used by inmates for complaints or requests), Mr. Young responded that there was "not time for that" because it takes two or three days before anyone responds to a kite.  Mr. Young was unsure of the exact words spoken in this conversation, but that "was the gist of it"; he had told the sergeant that he felt threatened and "explained it was an emergency, urgent."  The sergeant "wasn't really involved in the conversation"; he was "fiddling around with paperwork and blew it off."  When questioned further, Mr. Young said that he concluded that Sergeant Coolidge "blew him off" based on the sergeant's

statements and his "condescending" manner when he told Mr. Young to speak to someone else. Mr. Young added that "[y]ou got a real sense of do I care about you? Go talk to such and such. Go talk to somebody else."

The next day, Mr. Young and Mr. Brown approached Sergeant Selk, who was then running the unit. Mr. Young testified that he told Sergeant Selk basically what he had told Sergeant Coolidge. He reported that Mr. Whitefeather had threatened him, and that he (Mr. Young) had been incarcerated for ten years, had never been in an altercation, and did not want to "have any situation." Mr. Young testified that he looked Sergeant Selk "in the face" while telling him that he was being threatened and that it was "an urgent matter." Sergeant Selk did not take any action on Mr. Young's request.

Later the same day that Mr. Young spoke to Sergeant Selk, Mr. Whitefeather, with the assistance of two other inmates, attacked Mr. Young while he was lying on his bunk. They had heated a mixture of honey, hair gel, tea, and water in a microwave oven, and Mr. Whitefeather poured the hot mixture on Mr. Young's face, neck, and chest, causing him second degree burns. Mr. Whitefeather then beat Mr. Young with a rock, wrapped in a sock, that was the size of a fist. Mr. Young was taken to the hospital for treatment. In his complaint, he seeks damages for physical and psychological injuries resulting from the assault.

## II.

"Qualified immunity protects state officials from civil liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shockency v. Ramsey County*, 493 F.3d 941, 947 (8th Cir. 2007) (internal quotation marks and citations omitted). When deciding whether an official is entitled to qualified immunity, we first determine whether he or she violated a federal right at all; if so, we then determine whether that right was

-4-

clearly established. *See Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Coonts v. Potts*, 316 F.3d 745, 750 (8th Cir. 2003).

A.

Because being subjected to assault is not "part of the penalty that criminal offenders [must] pay for their offenses," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), the eighth amendment's prohibition against cruel and unusual punishment requires prison officials to "take reasonable measures to guarantee" inmate safety by protecting them from attacks by other prisoners, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). Of course, prison officials do not commit a constitutional violation every time one prisoner attacks another. *See id.* at 834; *Blades v. Schuetzle*, 302 F.3d 801, 803-04 (8th Cir. 2002). In order to establish an eighth amendment failure-to-protect claim, a plaintiff must show that the prison official was deliberately indifferent to a "substantial risk of serious harm." *Farmer*, 511 U.S. at 828. To succeed on such a claim, the plaintiff must first establish that the alleged constitutional deprivation was "objectively, sufficiently serious," which requires a showing that the official's failure to protect resulted in the inmate being "incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834.

Sergeants Coolidge and Selk argue that Mr. Young failed to offer sufficient evidence that Mr. Young actually faced a substantial risk of serious harm. At oral argument, the defendants' counsel maintained that since the question is whether there was actually a substantial risk – as opposed to whether Mr. Young described a substantial risk to the prison officials – Mr. Young can establish this element of his eighth amendment claim only through evidence of what Mr. Whitefeather said and did when he arrived at the cell. We agree that Mr. Whitefeather's conduct, rather than Mr. Young's account to the defendants, is the most probative evidence of the degree and type of risk that he faced, though we think that evidence of his state of mind might also be of some relevance. For example, the fact that Mr. Young promptly reported

a threat, asked to be moved immediately, and, when no help was forthcoming, made the same plea the next day, may be some evidence of the existence of a risk of harm. In a case that the defendants rely on, we considered a plaintiff's failure to express fear or to accept an offer of protective custody as some evidence that a substantial risk of serious harm did not exist. *See Berry v. Sherman*, 365 F.3d 631, 634-35 (8th Cir. 2004).

In any event, we believe that Mr. Whitefeather's conduct upon his arrival in Mr. Young's cell alone raises a reasonable inference of a substantial threat of violence against the plaintiff. Mr. Young, who had been incarcerated for ten years, testified that prisoners usually set out ground rules for how they will share the space when they are first placed in a cell together. Consistent with this practice, Mr. Young immediately offered to accommodate Mr. Whitefeather, but Mr. Whitefeather said nothing in response. Nor did he respond when Mr. Young told him that the room would generally be his (Mr. Whitefeather's) to use.

When Mr. Young asked that the television be turned down for the short period during his lunch break so that he could take a nap, Mr. Whitefeather unexpectedly exploded in a rage. He challenged Mr. Young by shouting, "You don't tell me what to do or anything else." Mr. Young's attempt to mollify him seemed to have the opposite effect. When Mr Young said that he had been speaking "out of respect," Mr. Whitefeather cursed at Mr. Young and was "like a deranged man about the respect": He said that he didn't "have to respect nobody" and that he would do whatever he wanted to do. Mr. Whitefeather, who is a Native American, also told Mr. Young that he was "affiliated." According to Mr. Young, the Native American prisoners at MDOC-RC were pretty "clicked up," which, he said, is "prison terminology as far as gangs and affiliations." We think that a factfinder could infer from this evidence that Mr. Whitefeather was saying that he would be joined by other Native American prisoners in any attack on Mr. Young, who is not a Native American, and Mr. Whitefeather certainly made it clear that Mr. Young would be

confronted by more than one other prisoner in addition to Mr. Whitefeather: As we have already said, after announcing that he would do whatever he wanted to do, Mr. Whitefeather added, "If you have a problem with that you can deal with me and my boys."

Mr. Young testified that he felt threatened not only by Mr. Whitefeather's words, but also by his "physically threatening position" and "the whole tone, how he was telling me, as far as what he told me, he was affiliated, mother fuck you." Mr. Whitefeather spoke "very loudly and very sharply at me as one would if you're being threatened," and "[m]ost people in prison don't come off the bat talking to you like that." "In prison, when people are talking to you in a harsh tone," it means that you are being threatened. "It's ... a basic warning sign. Listen, I'm ready to fight. ... When you start telling them what you're not going to do, using the MF word and everything else, that's basically saying, 'I'm threatening you' " or they are "deranged ... whatever he is, I need to get out of the room."

We believe that this evidence is sufficient to support a finding that there was a substantial risk of serious harm to Mr. Young. As the Supreme Court remarked in *Farmer*, 511 U.S. at 844-45, inmates are, on the whole, "dangerous men," and we think that the record here supports an inference that Mr. Whitefeather was a dangerous man who was particularly volatile, that he was easily offended and enraged, and that he was willing to attack – with the assistance of his "boys" – when in a state of rage. We also believe that Mr. Young's testimony about the manner in which prisoners threaten each other would support a finding that Mr Whitefeather indeed engaged in threatening conduct, and that his remaining in the cell with Mr. Young created a substantial risk of serious harm. The fact that Mr. Young immediately sought a cell change serves only to strengthen our conclusion.

Sergeant Coolidge and Sergeant Selk next contend that Mr. Young failed to present sufficient evidence of the subjective aspect of his eighth amendment claim.

To meet this requirement, Mr. Young had to show that the defendants "exhibited a sufficiently culpable state of mind, that is, [they] must have been deliberately indifferent to a substantial risk of serious harm to [Mr. Young]." An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it, *see id.* The Constitution requires such a state of mind before liability can attach because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Lenz*, 490 F.3d at 995 (internal quotation marks and citations omitted); *see also Farmer*, 511 U.S. at 834. The question of whether the official knew of the substantial risk is a factual one "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842.

We conclude that Mr. Young's evidence was sufficient to avoid summary judgment on this point. He testified that he told both the officials that he had been threatened by Mr. Whitefeather, that his circumstances were urgent, that he needed to be moved immediately, and that it was an emergency. In addition, he testified that he told Sergeant Coolidge that Mr. Whitefeather was "deranged," and that Mr. Brown told Sergeant Coolidge that there was "something wrong" with Mr. Whitefeather. We think that the information provided to the defendants was sufficient to support a finding that they were aware of a substantial risk of serious harm to Mr. Young.

We have little difficulty concluding also that the evidence could support a finding that Sergeants Coolidge and Selk did not respond reasonably to the risk. Even if they suggested that Mr. Young file a kite, ample evidence supported a finding that kites were processed too slowly to protect a prisoner from an immediate threat. We also reject the officials' contention that prisoners generally knew by "word of mouth" or by going through their "daily activities" that they could avoid a dangerous roommate by refusing to re-enter their cell at the appointed time. Initially we note that there is no evidence that Mr. Young ever knew that he had this option. In addition, we think that the officials, by making this argument, are attempting to shift

-8-

responsibility for protection to the prisoners themselves and asking them to engage in behavior that might well result in disciplinary action.

The defendants rely on *Prater v. Dahm*, 89 F.3d 538, 541-42 (8th Cir. 1996), for their contention that it was not enough to show that they were aware of a threat; they maintain that they could not be found to know of a substantial risk of serious harm without having more factual information. We think that *Prater* is inapposite. In that case, we reversed the district court's denial of judgment on the pleadings based on qualified immunity. The plaintiff alleged that the prison officials knew that another prisoner in the same facility had threatened him, and the defendants here rely on our statement in *Prater* that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.* at 541. But we think that by stating that threats, "under all circumstances," do not impute a knowledge of a substantial risk of harm, we certainly implied that in some circumstances, the knowledge of threats will support such a finding. *See e.g., Erickson v. Holloway*, 77 F.3d 1078, 1080 (8th Cir. 1996). We noted, moreover, that the plaintiff's own allegations belied the existence of a substantial risk: He admitted in his complaint that both he and the other prisoner had assured the officials that "there would be no trouble"; and the plaintiff did not dispute that the two prisoners had been in the same prison for a "substantial period of time without incident." *Id.* at 542. Here the officials conducted no investigation, the inmates did not give any assurances of "no trouble," and Mr. Young and Mr. Whitefeather shared a small cell for less than two days before the incident. In addition, Mr. Young reported not only that he had been threatened, but he used words such as "urgent" and "emergency" to describe his circumstances and notified Sergeants Coolidge and Selk that he needed to be moved immediately, and the defendants simply had no evidence to the contrary.

We also note that Sergeant Selk himself testified that if an inmate reported that he had been threatened, he would deem it "serious," the inmates would be separated,

and an investigation would be conducted. Mr. Young testified that he told the defendants that he had been threatened. Although the defendants now argue that Mr. Young should have provided more detail to them about the threat, Sergeant Selk testified that prisoners did not generally do so because they were afraid that they would be overheard and labeled "snitches." We conclude therefore that the evidence was sufficient to support an eighth amendment claim.

B.

Although we have concluded that Mr. Young's evidence was sufficient to support a conclusion that the Constitution was violated, Sergeant Coolidge and Sergeant Selk would be entitled to qualified immunity unless their conduct violated clearly established constitutional rights "of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This determination is undertaken in light of the law as it existed at the time and the "specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court, however, has made it clear that there need not be a case with "materially" or "fundamentally" similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution. *Hope*, 536 U.S. at 741. The "salient question ... is whether the state of the law" gave the officials "fair warning that their alleged [conduct] was unconstitutional." *Id.*

The defendants in their brief do not focus on this aspect of qualified immunity. First of all, in any case, it was no doubt clearly established long before 2004, when Mr. Young was assaulted, that the eighth amendment required prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 832 (internal quotation marks and citation omitted). And we think that the evidence of Mr. Whitefeather's conduct, in addition to the evidence of the information provided to Sergeants Coolidge and Selk, all viewed favorably to Mr. Young, showed a violation of a clearly established eighth amendment right to protection and gave the officials "fair warning" that their conduct violated that clearly established right. *See*

-10-

*Hope*, 536 U.S. at 741. Sergeant Selk's testimony bolsters our conclusion: He agreed with Mr. Young that inmates would not generally talk about the details of a threat at the guard desk where other prisoners were likely to overhear them, and he implied that the guards commonly relied on the use by inmates of certain language, including the report of a "threat," as notice that the inmate was in danger and should be separated from the prisoner who threatened him until an investigation was conducted.

### III.

Accordingly, we affirm the district court's order denying qualified immunity to Sergeant Coolidge and Sergeant Selk, and we remand the case to that court for further proceedings.

_____