# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 09-2225

_____

| | | |
|---|---|---|
| Timothy Nelson, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Dorn Shuffman; Diane McFarland; | * | |
| Karen Adams, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Alan Blake; Linda Meade, | * | |
| | * | Appeal from the United States |
| Defendants - Appellants, | * | District Court for the Eastern |
| | * | District of Missouri. |
| Margaret Chessey, | * | |
| | * | |
| Defendant, | * | |
| | * | |
| Marissa Richardson; Connie Roberts; | * | |
| Wiley Leon Maxwell; Dannial Danny | * | |
| Swyers, | * | |
| | * | |
| Defendants - Appellants, | * | |
| | * | |
| Ronald Scharader; Mark Miller; John | * | |
| Doe; Jane Doe, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Martha Bellew-Smith, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: January 12, 2010
Filed: May 7, 2010
_____

Before MURPHY and BYE, Circuit Judges, and STROM,[1] District Judge.
_____

BYE, Circuit Judge.

Timothy Nelson brought a lawsuit under 42 U.S.C. § 1983 alleging thirteen officials at the Missouri Sexual Offender Treatment Center violated his constitutional rights. The defendants moved for summary judgment based on qualified immunity and the district court[2] dismissed Nelson's claims against six of the thirteen defendants. The remaining seven defendants appeal the district court's order denying summary judgment. We affirm.

I

Timothy Nelson was convicted of, and served prison terms for, sexual assault and escape. On December 10, 2004, after completing his prison sentences, he was transferred to the Missouri Sexual Offender Treatment Center ("Treatment Center") for evaluation and possible civil commitment under Missouri's sexually violent predator statute. The defendants in the instant case are all employees of the Treatment Center, including: Dr. Martha Bellew-Smith, Ph.D., Clinical Director; Alan Blake, Chief Operating Officer; Wiley Maxwell, Security Aide; Dr. Linda Meade, Ph.D.,

_____

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

[2]The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

-2-

Clinical Psychologist and Clinical Lead on Hoctor 3 ward; Marissa Richardson, Licensed Clinical Social Worker; Connie Roberts, Registered Nurse; and Danny Swyers, Security Aide.

Upon arrival at the Treatment Center, Nelson was housed as a detainee in the Blair unit, a ward to which newly admitted residents were often assigned. Treatment Center policy requires staff to complete medical, psychiatric, nursing, and social service assessments on all new residents prior to making a ward assignment. Thereafter, residents may only be transferred to different wards based on a treating psychiatrist's clinical recommendation. There is no evidence indicating the required assessments were completed before Nelson was placed in the Blair unit or prior to his transfer to the Hoctor 3 ward. Richardson, a Licensed Clinical Social Worker, reviewed Nelson's End of Confinement report from the Missouri Department of Corrections ("MDOC") which indicated his history of sexual violence. After her review, Richardson initiated a discussion with certain Treatment Center staff to determine the appropriate ward assignment for Nelson.

On December 15, 2004, before the required assessments were completed, Blake, Bellew-Smith, Meade, and Richardson decided to transfer Nelson from Blair to Hoctor 3 ward, which is reserved for residents with severe behavioral problems. Hoctor 3 residents typically have committed repeated rule violations or are a serious risk to themselves, staff, or other residents. The district court found no evidence indicating Nelson met with any of the defendants before he was transferred, committed any rule violations, or that he was a danger to himself, staff or other residents.

At Hoctor 3, Nelson was assigned to share a room with D.D., who had been admitted to the Treatment Center on September 23, 2004. The evidence indicates D.D. was "very violent," "out of control," and "explosive." In 1983, he was charged with the rape of a fourteen-year-old male, and in 1994 he was named in two

harassment complaints filed by men who alleged he made phone calls demanding oral sex. While in jail on the harassment charges he restrained a sixteen-year-old cell mate, performed oral sex on him, and threatened to kill him if he reported the assault. While incarcerated for the assault, D.D. accumulated 253 conduct violations. Four of the violations involved possession of dangerous contraband, assault, conspiracy to commit murder, and sexual misconduct. The majority of D.D.'s time in prison was served in administrative isolation because of his frequent misconduct.

When admitted to the Treatment Center, D.D. was assessed as presenting a moderately high risk for violent and aggressive behavior. The reviewing psychologist concluded D.D. did not seriously injure anyone while incarcerated in prison largely because he was kept separate from other prisoners for the majority of his prison term. D.D.'s social work assessment, contained in his resident chart, reported his desire to rape other detainees or staff. While at the Treatment Center, D.D.'s history of conduct violations continued unabated. A staff person was assigned to watch him at night because he would walk around the ward talking about "raping different people." His resident chart is replete with reports of sexual misconduct, harassment, and physically threatening behavior, including bragging about raping a seventeen-year-old in prison, sexual advances towards another resident, an assault on a resident, and threats to physically and sexually assault other residents. D.D.'s first roommate requested to be moved because D.D. asked to perform oral sex on him. When confronted by staff regarding the allegation, D.D. verbally abused the staff and made sexually suggestive comments about oral sex. A second resident also reported D.D. was sending him sexually suggestive notes indicating he wanted sex from the resident. In his first month at the Treatment Center, D.D. incurred fifteen "intolerable violations" and was placed in restraints and protective isolation due to a "pattern of unacceptable behavior to threatening bodily harm" and "assaultive behavior."

On October 12, 2004, D.D. was placed in restraints for the safety of staff and other residents. On October 14-18, 2004, his misconduct included violations for

sexual misconduct, assault on staff, and threats of physical violence. On October 18, 2004, he incurred twenty-one misconduct violations, threatening to murder staff and their families and banging on walls, tables and doors. He was placed in restraints and drugged. When released from isolation he continued to threaten staff and was kept in restraints due to fears about his "volatility and possible risk to peers and staff." On October 25, 2004, his progress notes indicate he incurred at least sixteen violations and staff requested help in determining how to handle his behavior.

D.D.'s threatening and sexually inappropriate behavior continued throughout November and December 2004, and he spent much or all of those months in protective isolation, physical restraints or "Total Ward Restriction." On December 8, 2004, D.D.'s former roommate, who had previously filed a complaint regarding D.D.'s sexually threatening behavior, filed a second complaint alleging D.D. was exposing himself. Meade advised the former roommate the complaint was being reviewed by Bellew-Smith and Blake, and the treatment team was aware of D.D.'s ongoing behavioral issues, including frequent sexual advances toward other residents. On December 10, 2004, D.D. was released from protective isolation and on December 15, 2004, Nelson was transferred to Hoctor 3 and assigned to share a room with D.D..

When Nelson was assigned to D.D.'s room, the former roommate who had twice filed complaints against D.D. expressed concern to, among others, defendants Maxwell and Swyers, indicating he feared for Nelson's safety. Maxwell and Swyers acknowledged the concerns and Maxwell stated he was aware D.D. had attempted to rape a sixteen-year-old male in jail. Other staff members testified at deposition they believed Nelson, who was much younger and physically smaller than D.D., fit the profile of D.D.'s sexual assault victims.

In the early morning hours of December 16, 2004, D.D. sexually assaulted Nelson. The events began when D.D. performed oral sex on Nelson. Nelson contends he complied with D.D.'s actions because D.D. claimed to have a weapon and

demanded sex in return for Nelson's safety. After performing oral sex on Nelson, D.D. left the room. Within several minutes, D.D. returned to the room and violently assaulted Nelson. D.D. struck Nelson several times in the face, held his face into the pillow, and anally penetrated him with his finger and penis, resulting in anal tearing and bleeding that required medical treatment. Staff reported Nelson was visibly upset after the attack and was observed curled up crying on the floor and defecated and urinated on himself before being removed to the hospital.

Following the rape, Nelson was unable to eat or sleep. A psychological assessment concluded he was traumatized by the assault and was suffering from anxiety. Bellew-Smith concluded Nelson's symptoms were consistent with those commonly exhibited by victims of sexual assault.

Nelson requested psychological treatment which was authorized by Blake. Bellew-Smith determined psychological treatment was necessary and agreed to provide a series of eight weekly sessions to help Nelson deal with the trauma of the rape. The first of the sessions was not held until February 4, 2005, approximately fifty days after the sexual assault, and only after Nelson filed two complaints regarding the delay in providing treatment and threatened legal action if the sessions were not commenced. According to Nelson, at the first session held February 4, 2005, he asked Bellew-Smith why he had been placed in a room with a known rapist. He contends Bellew-Smith told him his own conduct caused his earlier imprisonment, his subsequent transfer to the Treatment Center, and ultimately his placement on the Hoctor 3 ward. Thereafter, Nelson refused to participate in further treatment sessions with Bellew-Smith and, on February 7, 2005, he filed an abuse and neglect charge against her, claiming she failed to provide the necessary psychological treatment.

The same day Nelson filed the abuse and neglect charge he was transferred to the Hoctor 5 ward and held in isolation. The transfer order does not state any reason for transferring Nelson, and the evidence indicates construction of Hoctor 5 was not

completed and it housed only one other inmate who was shackled twenty-four hours a day. While housed in the ward, Nelson continued to request psychological services and filed grievances when a new doctor was not assigned. He contends Meade tore up a grievance filed before his transfer to Hoctor 5, and claims while housed there he was denied access to legal counsel, mail, family, recreation, and phone calls.

Nelson brought suit under 42 U.S.C. § 1983 against thirteen employees of the Treatment Center alleging: 1) failure to protect him from the sexual assault; 2) failure to provide adequate psychological treatment in response to the rape (deliberate indifference to a serious medical need); 3) denial of access to the courts by destroying the grievance and precluding contact with legal counsel; and 4) retaliation and violations of due process for transferring him to the Hoctor 5 ward. All thirteen defendants moved for summary judgment citing qualified immunity. The district court dismissed the claims against six defendants but denied summary judgment as to the remaining seven. On the failure to protect claim, the court denied summary judgment to Bellew-Smith, Maxwell, Meade, Richardson, Roberts, and Swyers, finding a genuine issue of material fact as to whether the defendants exhibited deliberate indifference to the serious risk of an attack by D.D. On the failure to provide psychological treatment, the court denied summary judgment to Bellew-Smith, finding a genuine issue of material fact as to whether she exhibited deliberate indifference by unreasonably delaying treatment she determined was necessary and appropriate to address the trauma of the rape. On the retaliation and due process claim, the court denied summary judgment to Blake, Bellew-Smith, Meade, and Richardson, concluding there were genuine issues of material fact regarding whether the transfer was in retaliation for filing grievances and threatening legal action, and whether the transfer was punitive in violation of the right to due process. Each of the defendants now appeals the district court's denial of summary judgment based on qualified immunity.

## II

This court reviews a district court's grant of summary judgment de novo. Fischer v. Andersen Corp., 483 F.3d 553, 556 (8th Cir. 2007) (citing Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 841 (8th Cir. 2002)). When the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Id. (citing Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

Ordinarily, orders denying summary judgment are not final and appealable and we lack jurisdiction to consider an appeal from the denial. Miller v. Schoenen, 75 F.3d 1305, 1308 (8th Cir. 1996). We do, however, have limited jurisdiction to consider an interlocutory appeal from the denial of summary judgment based on qualified immunity. Id. "Our review is limited to determining whether the official is entitled to qualified immunity based on the summary judgment facts as described by the district court." Beck v. Wilson, 377 F.3d 884, 889 (8th Cir. 2004) (citing Hawkins v. Holloway, 316 F.3d 777, 781 (8th Cir. 2003)).

Government officials are generally afforded qualified immunity under section 1983 when performing discretionary functions unless their conduct violates clearly established law. Id. (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Under the two-stage inquiry employed by this court, we first determine whether the facts, viewed in the light most favorable to the plaintiff, establish a violation of a constitutional right. Id. The second question is whether the relevant constitutional right was clearly established at the time of the alleged violation. Id.

A.  Failure to Protect

The defendants first assert they are entitled to qualified immunity on Nelson's claim they failed to protect him from sexual assault by his roommate.  "[T]he eighth amendment's prohibition against cruel and unusual punishment requires prison officials to 'take reasonable measures to guarantee' inmate safety by protecting them from attacks by other prisoners." Young v. Selk, 508 F.3d 868, 871-72 (8th Cir. 2007) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)).[3]  Prison officials act unreasonably – thereby violating the Eighth Amendment – when they are "deliberately indifferent to a 'substantial risk of serious harm.'"  Id. at 872 (quoting Farmer, 511 U.S. at 828).  To prove deliberate indifference, an inmate must make a two-part showing: "The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious.  The second requirement is subjective and requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.'" Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008) (quoting Farmer, 511 U.S. 834) (internal citation omitted).  The deprivation is "'objectively, sufficiently serious,' [under the first requirement when] the official's failure to protect resulted in the inmate being 'incarcerated under conditions posing a substantial risk of serious harm.'" Young, 508 F.3d at 872 (quoting Farmer, 511 U.S. at 834).  "An official is deliberately indifferent [under the second requirement] if he or she actually knows of the substantial risk and fails to respond reasonably to it." Id. at 873 (citing Farmer, 511 U.S. at 844-45).

_____

[3]Nelson's constitutional claims allege violations of the Eighth and Fourteenth Amendments.  As a detainee, Nelson is protected under the Fourteenth Amendment rather than the Eighth Amendment.  For purposes of our analysis, the distinction is irrelevant because we have previously determined the Fourteenth Amendment provides detainees at least the same level of constitutional protection as the Eighth Amendment does to prisoners. Hott v. Hennepin County, Minnesota, 260 F.3d 901, 905 (8th Cir. 2001).  Accordingly, we will analyze Nelson's Fourteenth Amendment claims under the same standards applied to prisoners' Eighth Amendment claims.

When considering the first requirement, the assailant's conduct can provide the court "the most probative evidence of the degree and type of risk that [the inmate] faced." Id. at 872. When viewed in the light most favorable to Nelson, as found by the district court, evidence of D.D.'s conduct shows a substantial risk of serious harm to Nelson existed. D.D. had previously sexually assaulted at least one young male while in jail and was eventually imprisoned for the sexual assault of another. D.D. also demanded sex from a former roommate and solicited sex from other residents. Further, during his tenure at the Treatment Center, D.D. subjected staff and residents to a relentless barrage of physical and sexual threats, assaultive and sexually explicit behavior, and related violent and aggressive misconduct. Because of his potential for violent and aggressive behavior, D.D. spent much of his time in isolation or restraints. We are unpersuaded by the defendants' suggestion that D.D.'s conduct was limited to mere vulgar threats, as demonstrated by the evidence found by the district court set forth above. Rather, it is readily apparent Nelson faced an objectively serious risk of harm by being placed in a room with D.D.

When considering the second requirement, the court asks whether Nelson has presented sufficient evidence of the subjective aspect of his Eighth Amendment claim. "To meet this requirement, [Nelson must] show that the defendants exhibited a sufficiently culpable state of mind, that is, [they] must have been deliberately indifferent to the substantial risk of serious harm to [Nelson]." Young, 508 F.3d at 873 (citation and internal quotation marks omitted). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." Id. (citing Farmer, 511 U.S. at 844-45). "The question of whether the official knew of the substantial risk is a factual one 'subject to demonstration in the usual ways, including inference from circumstantial evidence.'" Id. (citing Farmer, 511 U.S. at 842). Nelson need not show "that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842. Moreover, "in order to have a viable deliberate indifference claim,

-10-

a plaintiff is *not* required to allege and prove that the defendant . . . specifically knew about or anticipated the precise source of the harm." Kahle v. Leonard, 477 F.3d 544, 551 (8th Cir. 2007) (quoting Krein v. Norris, 309 F.3d 487, 491 (8th Cir. 2002)).

Here, the district court correctly held Nelson's evidence is sufficient to avoid summary judgment on the subjective component of his failure to protect claim. As previously noted, D.D. had a history of sexually assaulting vulnerable young males, and his conduct after arriving at the Treatment Center can be described as violent, aggressive, assaultive, and out of control. Through their various capacities at the Treatment Center, each of the seven defendants were fully aware of D.D.'s past predatory behavior, and of the nature and sheer quantity of sexual and physical misconduct exhibited at the Treatment Center. D.D. was a perpetual source of fear and frustration for staff and a constant subject of disciplinary actions, e.g., isolation and physical restraints, necessary to protect staff and residents.

The defendants argue Nelson mischaracterizes the evidence of D.D.'s prior sexual crimes and misconduct committed while at the Treatment Center. The panel, however, is limited on appeal to determining whether, based on the facts as alleged, the defendants recklessly disregarded an objectively serious risk of harm to Nelson by placing him in the same room as D.D. Beck, 377 F.3d at 889. Whether Nelson is ultimately able to prove the alleged factual bases for his claims is a matter left for the finder of fact – not the appellate court on interlocutory appeal. Based on the facts as alleged, we affirm the district court's denial of summary judgment on Nelson's failure to protect claim.

B. Failure to Provide Adequate Psychological Treatment

Bellew-Smith argues the district court erred in denying her motion for summary judgment on Nelson's claim of deliberate indifference to serious medical needs. Nelson bases his claim on, among other evidence, Bellew-Smith's diagnosis he was

suffering from psychological trauma common to victims of violent sexual assault, and her recommendation Nelson receive a series of eight psychological treatment sessions. According to Nelson, despite recommending the treatments, Bellew-Smith failed to provide the required sessions and only initiated treatment after he complained and threatened legal action if he was left untreated. Additionally, Nelson claims Bellew-Smith blamed him for the rape by telling him his placement at the Treatment Center, and his exposure to D.D., resulted from his own sexual crimes and imprisonment. Finally, Nelson claims his request for a different doctor was ignored even after he refused to participate in treatment with Bellew-Smith.

To prove his deliberate indifference claim,[4] Nelson must present evidence showing the Treatment Center's medical staff committed "acts or omissions sufficiently harmful to evidence deliberate indifference to [Nelson's] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). A prima facie case alleging deliberate indifference requires the inmate to demonstrate he suffered from an objectively serious medical need and prison officials actually knew of, but deliberately disregarded, the need. Meuir v. Greene County Jail Emps., 487 F.3d 1115, 1118 (8th

---

[4]Bellew-Smith suggests we apply the professional judgment standard announced by the Supreme Court in Youngberg v. Romeo, 457 U.S. 307, 324 (1982), which affords professionals a presumption of correctness in their decisions relating to conditions of confinement. We decline this invitation here because Youngberg was decided in context of the substantive due process rights of the civilly committed and the Supreme Court did not hold such rights were applicable to pretrial detainees such as Nelson. See Revels v. Vincenz, 382 F.3d 870, 874 (8th Cir. 2004) (concluding Youngberg applies to an involuntarily committed patient's substantive due process rights under the Fourteenth Amendment rather than the Eighth Amendment). See also Clouthier v. County of Contra Costa, 591 F.3d 1232, 1243-44 (9th Cir. 2010) (refusing to apply a professional judgment standard because Youngberg did not depart from the deliberate indifference standard that applies to pretrial detainees); Brown v. Budz, 398 F.3d 904, 909 (7th Cir. 2005) (declining to apply a professional judgment standard because even that standard would not allow a professional to be deliberately indifferent to a substantial risk of serious harm to a detainee in his care).

Cir. 2007) (citing <u>Dulany v. Carnahan</u>, 132 F.3d 1234, 1239 (8th Cir. 1997)); <u>see also</u> <u>Jolly v. Badgett</u>, 144 F.3d 573, 573 (8th Cir. 1998) (defining serious medical need as one which is obvious to a layperson).

Whether a prison's medical staff deliberately disregarded the needs of an inmate is a fact-intensive inquiry. <u>Id.</u> (citing <u>Coleman v. Rahija</u>, 114 F.3d 778, 784 (8th Cir. 1997); <u>Jensen v. Clarke</u>, 94 F.3d 1191, 1197-98 (8th Cir. 1996)). The inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment. <u>Id.</u> (citing <u>Dulany</u>, 132 F.3d at 1239) (holding "inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment")). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." <u>Taylor v. Bowers</u>, 966 F.2d 417, 421 (8th Cir. 1992). "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." <u>Dulany</u>, 132 F.3d at 1240.

Bellew-Smith does not dispute Nelson suffered emotional trauma or that she recommended eight sessions of psychological treatment for Nelson to deal with the trauma. Additionally, she does not dispute Nelson's claim she agreed to provide those treatments because she had experience treating male rape victims. She does, however, dispute that the treatments did not begin until February 4, 2005, and were not timely.

The district court's order references two meetings between Bellew-Smith and Nelson in advance of the February 4 session. The court, however, expressly held the eight sessions prescribed by Bellew-Smith to address the rape did not begin until February 4, and then only after Nelson submitted multiple requests for treatment and threatened legal action. Further, the court found there was evidence to support

-13-

Nelson's claim he was denied access to a different mental healthcare professional after refusing to be treated by Bellew-Smith. Once again, Bellew-Smith disputes the factual bases asserted by Nelson. But, based on the evidence described by the district court, a jury could conclude Nelson had a serious medical need and Bellew-Smith deliberately disregarded the need by failing to provide psychological treatment she prescribed. Accordingly, we affirm the district court's denial of summary judgment to Bellew-Smith on Nelson's deliberate indifference claim.

    C.  Retaliation/Due Process Claims

Finally, Bellew-Smith, Blake, Meade, and Richardson argue the district court erred in denying their motion for summary judgment on Nelson's claims of retaliation and violation of due process. Under these claims, Nelson argues he was subjected to a retaliatory or punitive transfer to the Hoctor 5 ward, which was unfinished and only housed one resident who was confined to shackles twenty-four hours a day. He alleges he was held in isolation there and denied access to his attorney, mail, family, recreation, and phone calls. Nelson further argues no reason was given for the transfer and the defendants did not comply with their own internal policies governing when residents could be transferred between wards. Finally, Nelson contends the unauthorized transfer occurred immediately after he filed an abuse and neglect charge against Bellew-Smith and several grievances complaining about, among other things, the defendants' failure to provide him necessary psychological treatment.

A prisoner's right under the First Amendment to petition for redress of grievances under a prison's grievance procedures is clearly established in this court. See Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) (recognizing the First Amendment right to petition for redress of grievances includes redress under established prison grievance procedures). Similarly, it has for over twenty years been the law of this circuit that actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983. Id. (citing Franco v. Kelly, 854 F.2d

584, 589-90 (2d Cir. 1988)). The right to be free from retaliation for availing one's self of the prison grievance process is also clearly established in other circuits. See, e.g., Rivera v. Senkowski, 62 F.3d 80,86 (2d Cir. 1995) ("[A]n inmate's right to be free of retaliation for filing grievances was in 1990 and 1991 a clearly established statutory or constitutional right of which a reasonable person would have known.") (internal quotation marks and citation omitted); Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995) (holding it is unconstitutional for a prison official to retaliate against an inmate for filing a grievance); Noble v. Schmitt, 87 F.3d 157, 162 (6th Cir. 1996) (holding retaliation directed against an inmate for filing a grievance violates clearly established constitutional law).

To prevail on a retaliation claim, Nelson must show 1) he engaged in a protected expression, 2) he suffered an adverse action, and 3) the adverse action was causally related to the protected expression. See Higdon v. Jackson, 393 F.3d 1211, 1219 (11th Cir. 2004). The first prong presents no barrier to Nelson's retaliation claim. He alleges the transfer was made in response to a charge of abuse and neglect and grievances he filed, and access to the grievance process is protected under the First Amendment.

As for the second prong, Nelson alleges he was housed in a structurally unfinished and inadequate ward with a single resident who was restrained at all times. He further alleges he was held in isolation and deprived of access to legal counsel, mail, family, recreation, and phone calls. These deprivations are sufficient to support a finding of adverse action under the second prong.

Similarly, the facts found by the district court provide sufficient evidence for a jury to conclude the transfer was causally related to Nelson's exercise of his right to file the abuse and neglect charge and the grievances. First, the evidence indicates Meade tore up one of Nelson's grievances and told him the matter would not be considered. Second, the transfer was made the same day Nelson filed the charge.

Third, the transfer order states no reason for Nelson's transfer and did not comply with the Treatment Center's internal policies for transferring residents between wards. Based on this evidence, a reasonable jury could conclude the defendants retaliated against Nelson. Accordingly, we affirm the district court's denial of summary judgment on Nelson's retaliation claim.

Nelson asserts the same facts as a basis for his due process claim, arguing his transfer was punitive and violated due process by imposing a punishment that had no legitimate institutional objective. He contends there is no evidence the transfer was in response to any misconduct on his part and was effectuated in violation of the Treatment Center's own policies. The defendants argue the alleged policies were not in effect at the time of the transfer and the transfer was based on the their professional assessment of Nelson's psychological needs.

As previously noted, it is not this court's function to resolve factual disputes on interlocutory appeal. Therefore, the defendants' claim the policies were not in effect cannot be considered. See White v. McKinley, 519 F.3d 806, 812 (8th Cir. 2008) ("A defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial; the appealable issue is the purely legal one.") (internal quotation marks and citation omitted). Further, the transfer order contains no indication as to why Nelson was transferred and supports an inference it was not based on any exercise of professional judgment. Finally, the timing of the transfer and destruction of one of Nelson's grievances also support a finding the transfer was not based on the defendants' assessment of Nelson's medical needs. Accordingly, we affirm the district court's denial of summary judgment on Nelson's due process claim.

For the foregoing reasons, we affirm the judgment of the district court.

_____