GRUENDER, Circuit Judge,
concurring in part and dissenting in part.
I concur in the court’s judgment reversing the denial of qualified immunity to Sheriff Dawson. However, I respectfully dissent from the judgment affirming the denial of qualified immunity to Moore.
Walton alleges that Moore is liable for failure to train under the Fourteenth Amendment. Without a showing that Moore’s subordinate, Bilinski, violated the Constitution, however, Moore cannot be liable for failure to train. See Carpenter v. Gage, 686 F.3d 644, 651 (8th Cir.2012). The court finds that Walton can prove “that Bilinski committed the underlying failure to protect violation which gives rise to Moore’s failure to train liability.” Ante at 1123. I disagree.
Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), requires Walton to establish that he faced “a substantial risk of serious harm” in order to prove that Bilinski violated the Constitution (as opposed to the jail’s policy[10]) by failing to protect him. Id. at 834, 114 S.Ct. 1970. Under Farmer, “the deprivation alleged must be, objectively, ‘sufficiently serious.’” Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The court holds that Walton’s *1127 sexual assault was “sufficiently serious to amount to a deprivation of constitutional dimension.” Ante at 1118 (quoting Spruce v. Sargent, 149 F.3d 783, 785 (8th Cir. 1998)). Undoubtedly, this attack left Walton “physically bloodied and emotionally bruised,” ante at 1114, and prison rape is a serious problem, Just Detention International, The Basics About Sexual Abuse in U.S. Detention, http://www.justdetention. org/en/factsheetq/basics — fact_sheetNmal. pdf (last visited May 7, 2014). “It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim’s safety.” Farmer, 511 U.S. at 834, 114 S.Ct. 1970. Indeed, Farmer establishes that even serious harms — including sexual assault — do not give rise to § 1983 liability unless the inmate demonstrates that the assault occurred while he was “incarcerated under conditions that posed a substantial risk that he would be sexually assaulted.” Spruce, 149 F.3d at 785-86; see also Irving v. Dormire, 519 F.3d 441, 447 (8th Cir.2008) (“To prove a sufficiently serious deprivation in failure to protect claims, an inmate must prove that prison officials caused him to be incarcerated under conditions posing a substantial risk of serious harm.”) (internal quotation marks and citation omitted). The court concludes that “leaving the cells unlocked overnight” created “an obvious, substantial risk to inmate safety,” ante at 1119 — linking the unlocked cells to an alleged constitutional right to “sleep without legitimate fear of a nighttime assault by another detainee,” ante at 1120. However, there was no evidence of any generalized substantial risk of harm from assault by other inmates at night.
Properly framed, the question is whether Flennory — who had a single prior in jail assault and who was housed in an adjacent unlocked cell — posed a substantial risk of assaulting a fellow inmate. The court eventually reaches the correct question but concludes, with little analysis, that the risk posed by Flennory in an unlocked cell was “obvious” because of Flennory’s single pri- or nighttime assault and Bilinski’s observation of Walton’s “very concerned” expression. Ante at 1120, 1122-23. “[FJailing to do anything to mitigate this risk,” the court suggests, “potentially fell below minimum constitutional standards.” Ante at 1120. For the following reasons, I disagree, concluding instead that Walton was not “incarcerated under conditions posing a substantial risk of serious harm.” Farmer, 511 U.S. at 834, 114 S.Ct. 1970.
In measuring whether an inmate faced a substantial risk of serious harm under Farmer, “the assailant’s conduct can provide the court ‘the most probative evidence of the degree and type of risk that [the inmate] faced.’ ” Nelson v. Shuffman, 603 F.3d 439, 447 (8th Cir.2010) (alteration in original) (quoting Young v. Selk, 508 F.3d 868, 872 (8th Cir.2007)). Accordingly, it is worth recounting some details about Flen-nory’s history at the Macon County Jail. It is undisputed that Flennory was housed in the jail’s general population without incident for 373 days spread over a fifteen-year period — the most recent being the 247 days from September 25, 2009, to May 29, 2010. On May 30, 2010, Flennory assaulted another inmate. The May 30 incident did not involve anal rape; rather, Flennory bit the inmate’s groin through his pants and reached down the back of his pants. Flennory spent the next two months segregated from the general population as a result of this infraction.
However, “[p]risons are not required to segregate indefinitely all inmates whose original crimes suggest they might be capable of further violence!, and t]he same is true for inmates who engage in violence while in prison.” Norman v. Schuetzle, 585 F.3d 1097, 1105 (8th Cir.2009) (internal citations and quotation marks omitted). We have afforded “substantial deference to *1128 prison officials to determine the best methods for dealing with dangerous inmates in the volatile environment that is prison life” — presumably including whether an inmate must remain in segregation. Holden v. Hirner, 663 F.3d 336, 342 (8th Cir.2011) (quoting Norman, 585 F.3d at 1105). Before being returned to the general population, Flennory was told that any future infractions would result in his being returned to segregation. Flennory stated that he understood and agreed to behave. When Flennory returned to the general population at the beginning of August 2010, he behaved well, even though, according to Bilinski, the cell doors remained unlocked. The record contains no evidence of misbehavior by Flennory for the entire month of August until the assault against Walton on August 30. For the five days Walton and Flennory were housed beside each other, from August 25 until August 30, Flennory was friendly toward Walton, playing cards with him-even on the night before and morning of the assault.
Compared to other cases in which we discerned a substantial risk of serious harm, Flennory’s pre-incident conduct while incarcerated is considerably less disturbing. For example, in Nelson, we held that an inmate posed a substantial risk of serious harm where he previously had sexually assaulted two males, “demanded sex from a former roommate and solicited sex from other residents,” “subjected staff and residents to a relentless barrage of physical and sexual threats, assaultive and sexually explicit behavior, and related violent and aggressive misconduct.” 603 F.3d at 447; see also Spruce, 149 F.3d at 785-86 (finding a substantial risk of serious harm where the plaintiff alleged that he was raped by more than twenty different inmates in a prison where the warden acknowledged a culture requiring inmates to fight against sexual aggressors). Unlike the repeatedly assaultive inmate in Nelson and the pervasive rape culture in Spruce, Flennory was involved in only one prior incident while incarcerated. That incident occurred on May 30 — three months before the August 30 assault on Walton — and involved behavior substantially less disturbing than his attack on Walton.
In addition, the facts of this case are less troubling than Holden, in which we found no substantial risk of serious harm. Identified as a vulnerable detainee, Holden was housed in protective custody with three cellmates. 663 F.3d at 339. His cellmates injured him in a fight in the cell. Id. Only four days before the fight, one of his cellmates had been involved in a fight with another detainee. Id. at 341. Yet we discerned no substantial risk of serious harm, because Holden was housed in protective custody “designed to provide greater supervision and security for inmates more likely to be assaulted.” Id. We arrived at this conclusion despite Holden, marked as a vulnerable detainee, being housed in the same cell as an inmate who had fought another detainee just four days earlier. By comparison, Flennory’s single prior incident took place a full three months before his attack on Walton. Therefore, I conclude that Flennory’s comparatively limited assaultive history at the jail is probative evidence that Walton did not face a substantial risk of serious harm.
Additionally, Walton’s “failure to express fear ... [is] some evidence that a substantial risk of serious harm did not exist.” Young, 508 F.3d at 872. Walton admits that he never told Bilinski, Moore, or any jail staff that Flennory had threatened him in any manner or that he had any other reason to fear Flennory. In fact, Walton consciously chose not to express fear regarding Flennory’s presence or conduct. On the day before the attack, Flennory indicated in a note to Walton that he intended to fellate him. However, Walton decided not to tell anyone about *1129 the note, instead flushing it down his cell toilet because he “didn’t take it seriousfly] at the time.” We have found no substantial risk of serious harm in an analogous case where the plaintiff, like Walton, failed to express fear. In Berry v. Sherman, 365 F.3d 631 (8th Cir.2004), the plaintiff shared a cell with an inmate who reportedly possessed a knife. Id. at 633. Although Berry eventually was attacked by his cellmate and two other inmates with a knife, we held that Berry failed to demonstrate a substantial risk of serious harm because Berry did not express fear for his safety prior to being attacked, despite knowing that his cellmate was reported to possess a knife. Id. The court attempts to distinguish Berry by observing that, unlike Berry, Walton testified he did not say anything, because Flennory had threatened to kill him if he spoke to jail staff. Ante at 1124-25. This distinction, however, is not responsive to Walton’s failure to express fear when he received Flennory’s fellatio note. To be clear, Walton’s failure to report the note to jail staff had nothing to do with being afraid of Flennory. Rather, Walton repeatedly testified that he simply “didn’t take it serious[ly].” Walton also admits that he failed to express fear verbally during Bilinski’s walkthrough the morning of the attack when Walton knew “or should strongly [have] suspectfed] that Mr. Flennory [wa]s going to want to have anal sex with” him. Although Bilinski noticed that Walton looked concerned during the walkthrough, I cannot agree that this look of concern, even combined with Flen-nory’s single prior assault, constituted a condition of incarceration posing a substantial risk of serious harm — particularly in light of Flennory’s positive history with Walton during which they played cards together and never engaged in violence. Accordingly, I consider Walton’s failure to express fear to be probative evidence that a substantial risk of serious harm did not exist.
The court claims that this decision does not create a “sweeping constitutional rule that every cell in every prison must be locked as soon as the sun sets.” Ante at 1120. This caveat rings hollow. The court’s ruling will apply if a cell contains an inmate who has committed a single assault while incarcerated and his neighbor looks concerned, even if the inmate has spent substantial time in segregation as punishment, has agreed to behave, and has behaved for a month. The court essentially imposes a “one-strike-you’re-out” rule — i.e., an inmate necessarily poses a substantial risk of serious harm if he has committed one prior in-jail assault and his neighbor looks concerned, and a jail is deliberately indifferent if it does not implement one or more of the court’s recommended security measures in response. Indeed, the court suggests that the Macon County Jail had to continue to “remove [Flennory] from the general population,” “lock every cell door,”[11] “conduct cell *1130 checks frequently] enough to prevent nighttime assaults,”[12] “rely on a combination of these methods,” “or ... develop a different approach not apparent from the record.” Ante at 1120. This simply cannot be. Incarcerating institutions must be able to determine, without fearing liability, that an offending inmate can be housed in community with other inmates without permanent locks or infallible monitoring after the inmate has been sufficiently punished and apparently reformed (e.g., as here, through substantial segregation, conversation with jail staff, and a month of demonstrated good behavior). The court forgets that “[a]n unfortunate by-product of our prison system is the incidence of violence between inmates,” and that “[w]hile unfortunate, all such incidents of violence do not violate” the Constitution. Falls v. Nesbitt, 966 F.2d 375, 380 (8th Cir.1992); see also Andrews v. Siegel, 929 F.2d 1326, 1330-31 (8th Cir.1991) (“[S]ome violence in prisons may be unavoidable due to the character of the prisoners.”) (ellipsis omitted) (quoting Martin v. White, 742 F.2d 469, 475 (8th Cir.1984)).
Accordingly, I conclude that Walton was not incarcerated under conditions that, measured objectively and without the benefit of hindsight, posed a substantial risk of serious harm. This necessarily means that Bilinski did not fail to protect Walton. Berry, 365 F.3d at 635 (holding that where evidence does not establish that plaintiff “objectively faced a substantial risk of harm,” the plaintiffs failure-to-protect claim fails). It follows that Moore is entitled to qualified immunity. See Carpenter, 686 F.3d at 651. For these reasons, I respectfully dissent from the judgment affirming the denial of qualified immunity to Moore.

. The court focuses .at length upon Bilinski's failure to comply with the jail’s nighttime cell-lock policy, concluding that the noncompliance was "an obvious, substantial risk to inmate safety." Ante at 1119 (quoting Farmer, 511 U.S. at 843, 114 S.Ct. 1970). However, a "sheriff's or his subordinates’ alleged violation of jail policies does not result in section 1983 liability.” Bailey v. Schmidt, 239 Fed.Appx. 306, 308 (8th Cir.2007) (per curiam) (citing Gardner v. Howard, 109 F.3d 427, 430-31 (8th Cir.1997)); see also Hocker v. Pikeville City Police Dep’t, 738 F.3d 150, 154, 156 (6th Cir.2013) (holding that in a § 1983 action against a law enforcement officer, the relevant inquiry is whether the officer violated the Constitution, not whether the officer violated a department policy). The court itself concedes that “viqlating an internal policy does not ipso facto violate the Constitution.” Ante at 1122. Indeed, in an analogous case brought under the Eighth Amendment, we clarified that "a prison official's violation of an internal regulation does not give rise to an Eighth Amendment claim of ‘cruel and unusual punishment,’ in the absence of” a constitutional violation. Falls v. Nesbitt, 966 F.2d 375, 380 (8th Cir.1992). In other words, Bilinski’s failure to comply with the jail’s nighttime cell-lock policy results in § 1983 liability only if it can be shown that Bilinski failed to protect Walton within the meaning of Farmer.

. The court suggests that we have imposed a cell-lock requirement in the past under similar circumstances, citing Wade v. Haynes, 663 F.2d 778 (8th Cir.1981), and Newman v. Holmes, 122 F.3d 650 (8th Cir.1997). Ante at 1121. Those cases are distinguishable given that the assailants in both Wade and Newman were housed in isolated confinement at the time of the attacks due to their known present dangerousness. Wade, 663 F.2d at 781; Newman, 122 F.3d at 651. Here, at the time of the attack, Flennory was housed in the general population, had not demonstrated any behavioral problems in the month following his return from segregation, and even played cards with Walton. Leaving Flennory’s door unlocked in the general population is not tantamount to leaving unlocked the doors of inmates in isolated confinement. The court also cites Irving v. Dormire, 519 F.3d 441 (8th Cir.2008), Pavlick v. Mifflin, 90 F.3d 205 (7th Cir.1996), and Riley v. Jeffes, 777 F.2d 143 (3d Cir.1985). Ante at 1121-22. Those cases also are distinguishable given that the guards in those cases, unlike Bilinski, intentionally *1130 opened the victims’ cell doors or gave inmates keys to allow access to other inmates' cells knowing their actions would cause harm. Irving, 519 F.3d at 447; Pavlick, 90 F.3d at 208-09; Riley, 777 F.2d at 146-47. Finally, the court cites Marsh v. Butler County, Ala., 268 F.3d 1014 (11th Cir.2001) (en banc). Ante at 1121. In Marsh, the institution was “so dilapidated that inmates could fashion weapons from pieces of the building.” Id. at 1027. Unlike this case, "conditions in a jail facility that allow prisoners ready access to weapons” contributed to a finding that a substantial risk of serious harm existed. Id. at 1028. No such condition of confinement was alleged in this case.

. Nor have we required cell monitoring with sufficient frequency such that the monitoring is necessarily efficacious. Jails and prisons are not subject to strict liability under the Constitution. Again, I turn to Holden as an example. In that case, the plaintiff was housed in the same cell as an inmate who had violently fought another inmate only four days before his attack on the plaintiff. However, we found no substantial risk of serious harm, because the inmate was housed in protective custody with greater supervision and security — even though that increased monitoring evidently was not frequent enough to prevent the harm.